GOUCHER *v.* NORTHWESTERN TRAVELING MEN'S ASS'N.

*(Circuit Court, E. D. Wisconsin. March 21, 1884.)*

1. INSURANCE—REPRESENTATIONS—GOOD HEALTH.
    A representation by an applicant for insurance that he is in possession of good health, means that he is free from apparent sensible disease, and unconscious of any derangement of important organic functions.
2. SAME—SEVERE ILLNESS.
    "Severe illness" means such as has, or ordinarily does have, a permanent, detrimental effect upon the physical system.
3. SAME—MISREPRESENTATION—INTENTION.
    A false answer, made without qualification, to an inquiry as to a matter of fact, annuls the contract of insurance, whether the reply is designedly untrue or not.

At Law.
*Mr. Hanson* and *D. S. Wegg,* for plaintiff.
*Jenkins, Winkler & Smith,* for defendant.

DYER, J., *(charging jury.)* The defendant is a corporation, created for the purpose of paying a fund to and protecting the families of those of its members who may be removed by death. It is provided by the constitution of the association, which is in evidence, that any man of good moral character and in good general health, and not over 40 years of age, who at the time of his application is, and for one year immediately prior thereto has been, engaged as a traveling salesman, traveling buyer, or traveling agent for any wholesale house, company, or corporation, is eligible to membership in the association. All applications for membership are referred to the board of directors of the association, who may require such proof as to them may seem proper, as to the applicant's qualifications and eligibility. All applicants are required to furnish a medical certificate, and by one of the rules it is required that applicants shall pass a medical examination. Admission to membership involves the payment of an initiation fee of five dollars, and also the further sum of two dollars for first assessment. The constitution also provides that it shall be the duty of the board of directors to take a general supervision of the business of the association, to decide on all applications for membership and on all proofs of death, and order assessments to pay death losses. Upon suitable proof of the death of any member

of the association, the board of directors are required to pay, of the amount collected by assessment of $2 upon each member, a sum not to exceed $5,000 to the person previously designated by the deceased, upon his application for membership, upon the books of the association, or by his last will and testament. Thus, as is apparent, the benefit of a species of life insurance is secured to the members of the association.

On the thirtieth day of December, 1881, M. C. Goucher, since deceased, made application for membership in this association. He certified in his application that he was a traveling man; that he would comply with all the requirements of the constitution and by-laws of the association; that he had answered all of the questions accompanying his application honestly and truthfully; and he thereby agreed that any misstatement or concealment of any fact that would impair the interests of the association, by him, should annul all claims that he or his heirs or assigns might have to any benefit arising from his connection with the association. Accompanying his application were certain questions addressed to the applicant, and answered by him, among which were the following: *Question* 10. "Are you now in good health, and do you usually enjoy good health?" To which his answer was, "Yes." *Q.* 22. "Is there any fact relating to your physical condition, personal or family history or habits, which has not been stated in the answers to the foregoing questions, and with which the association ought to be made acquainted?" To which he answered, "No." In his application the deceased named, as the person to whom he desired his death loss paid, his wife, Florette A. Goucher, the plaintiff in this suit. As part of the application, two persons, members of the association, certified among other things that they were well acquainted with Mr. Goucher, and that he was then in good health. It appears further that when the deceased made his application for membership he submitted to a medical examination by Dr. Thorndike, medical examiner for the association in Milwaukee, and certain questions pertaining to such examination were answered by Dr. Thorndike, among which are the following: *Question* 7. "Has he now or has he had any disease of the stomach, liver, spleen, kidneys, intestinal canal, or urinary organs?" To which the doctor answered, "No." *Q.* 11. "Has the party ever had any severe injury or illness?" To which the answer was, "Typhoid fever in 1866." Further, as part of question 11: "If so, has it had any perceptible effect on his constitution?" Answer, "No." The testimony of Dr. Thorndike tends to show that he made these answers upon personal examination of the applicant, and upon information then furnished him by the applicant. The application of the deceased, and the certificates, questions, answers, and report of medical examination, are in evidence. It appears that the application of Mr. Goucher was approved by the board of directors of the association, and he was admitted to membership on the seventh day of January, 1882. On the twelfth day of September, 1882, he

died, and thereafter proofs of death were delivered to the defendant. Payment of the insurance not being made, this suit was brought by the plaintiff, as the beneficiary designated in the application for membership, to recover the amount of the death loss, which is alleged to be $5,000. The question is, is she entitled to recover? and that depends upon whether the several questions which I have enumerated were truthfully answered. This is conceded by the plaintiff, it being expressly admitted by her counsel that these questions and answers relate to facts material to the risk which the defendant was asked to incur.

Some testimony has been offered by the plaintiff in support of the contention that by applying for additional proofs of the health of the insured after the original proofs of death were made, and by accepting from the plaintiff the amount of a death loss assessment after the death of the insured, the defendant is now estopped to set up the defenses to this action which it has interposed; but this claim is not insisted upon, and by waiver of the same the sole issue in the case for you to determine is, were the answers to the questions referred to true or untrue? And it is further agreed by counsel for the plaintiff that the answers to questions 7 and 11 in the medical examination shall be regarded and treated as the personal answers of the insured, M. C. Goucher.

The first question answered by the applicant, in his application for membership, to be considered by you, relates to the health of the deceased on the thirtieth day of December, 1881. He was asked: "Are you now in good health, and do you usually enjoy good health?" He answered, "Yes." It is contended by the defendant that this was not a truthful answer; that he was not then in good health, but, on the contrary, was at that time suffering from disease of the liver, and that his system was then weakened and depleted by physical disorder. The plaintiff insists that the deceased was not then afflicted by disease; that he was in good health, and usually enjoyed good health. The term "good health," as here used, does not import a perfect physical condition. It would not be reasonable to interpret it as meaning absolute exemption from all bodily infirmities, or from all tendencies to disease. It cannot mean that a man has not in him the seeds of some disorder. As has been well remarked by some of the law writers, "such an interpretation would exclude from the list of insurable lives a large proportion of mankind." The term "good health," as here used, is to be considered in its ordinary sense, and means that "the applicant was free from any apparent sensible disease, or symptoms of disease, and that he was unconcious of any derangement of the functions by which health could be tested." *Conver* v. *Phœnix Ins. Co.* 3 Dill. 226. Slight, unfrequent, transient disturbances, not usually ending in serious consequences, may be consistent with the possession of good health as that term was here employed. "The term must be interpreted with reference to the subject-matter and

the business to which it relates. * * * It means apparent good health, without any ostensible or known or felt symptom of disorder, and does not exclude the existence of latent unknown defects; * * * but a predisposition to" or manifestation of "a disease or disorder of such a character and to such a degree as to seriously or obviously affect the health, and to produce bodily infirmity, is incompatible with a representation of good health." May, Ins. § 295. With this understanding of the expression "good health," and in the light of the evidence, you will say whether the answer which the deceased made to this question was true or untrue; that is, was he or not, on the thirtieth day of December, 1881, in good health, and did he or not usually enjoy good health?

That part of the next question answered by the deceased, and necessary to be considered by you in connection with the answer thereto, is this: "Is there any fact relating to your physical condition * * * which has not been stated in the answers to the foregoing questions, and with which the association ought to be made acquainted?" *Answer.* "No." In answering this question, the deceased was bound to state any fact, not before stated, relating to his physical condition which he knew or considered, or which, in the exercise of a sound judgment on the subject, he should have known or considered, would be material for the defendant to know in passing upon his application for membership. He had no right to conceal or withhold any such fact, if it existed. "Concealment is the designed and intentional withholding of any fact material to the risk which the assured in honesty and good faith ought to communicate to the insurer; and every such fact wrongfully suppressed must be regarded as material, the knowledge or ignorance of which would naturally influence the judgment of the insurer in making the contract at all, or in estimating the degree or character of the risk." *Daniels* v. *Ins. Co.* 12 Cush. 425. It is charged that Mr. Goucher, in answering this question, concealed facts relating to his physical condition which should have been communicated. This involves intent,—knowledge on his part of such facts, and an intentional withholding of them. His answer to the question must be considered as only a representation to the extent of his knowledge or reasonable belief. If he knew of no fact relating to his physical condition with which the association ought to be made acquainted, other than what he had previously stated, then there could be no concealment. The testimony has disclosed what had been the health and physical condition of the deceased prior to his application for membership; and you will say whether there was any fact relating thereto with which the association ought to have been made acquainted, concealed by him in answering this question, in the sense in which I have defined concealment.

The next question is No. 7 in the medical examination: "Has he now or has he had any disease of the stomach, liver," etc.? *Answer.* "No." It is contended by the defendant that at that time he had dis-

ease of the liver, and that, therefore, the question was untruthfully answered. This claim is vigorously contested by the plaintiff, so the question for you to decide is, did the deceased at that time have, or had he previously had, disease of the liver? In speaking to you upon this question I cannot do better than to use substantially the language of the court in a case cited on the argument: In construing such a contract as this, words must have the sense in which the parties used them; and to understand them as the parties understood them, the nature of the contract, the objects to be attained, and all the circumstances must be considered. By this question, as by other questions inserted in this application, the defendant was seeking for information bearing upon the risk which it was to take,—the probable duration of the life to be insured. It was not seeking for information as to merely temporary disorders or functional disturbances, having no bearing upon general health or continuance of life. Many persons have at times some affection of the liver, causing slight functional derangement and temporary illness, and yet, in the contemplation of parties entering into contracts of life insurance, and having regard to general health and the continuance of life, it may safely be said there was no disease of the liver. In construing a contract like this, it must be generally true that before any temporary ailment can be called a disease, it must be such as to indicate a vice in the constitution, or so serious as to have some bearing upon general health and the continuance of life, or such as according to common understanding would be called a disease. *Cushman* v. *U. S. Life Ins. Co.* Ins. Law J. Aug. 1877, p. 601. A man may have predisposition to disease of the liver; he may have premonitory symptoms of its threatened approach, and still at the time not have the disease; and the question here is, if the deceased had any disorder, was it at the time he made his application, disease of the liver, or had he ever had that disease? If he then had, or had before that time had, the disease, then the question was not truthfully answered; and whether his answer was intentionally untrue is immaterial, if in fact it was untrue. He answered the question unqualifiedly in the negative, and he was bound by the answer whether it was designedly untrue or not, if it was untrue. So, gentlemen, considering all the evidence, you must decide whether on the thirty-first day of December, 1881, or at any time previously, the deceased had or had not disease of the liver.

It is claimed by the defendant that at various times previous to the application the deceased had certain illnesses; that at the time of his application he was not in good health; that his alleged ill-health was caused by a diseased liver; that external developments of that disease appeared in January and February, 1882, soon after he became a member of this association; that in March he was operated upon, and an abscess in his liver was opened; that he died September 12, 1882, of hemorrhage of the stomach, and that the remote cause of death was abscess of the liver. Upon these and other alleged facts

and circumstances in the case, it is insisted that when the deceased made his application for membership he had disease of the liver. Generally, it is claimed by the plaintiff that the attacks of illness which the deceased had before his application were slight, rare, and temporary, and had no relation to any disorder of the liver; that he was in good health, and had no disease of the liver when he applied for membership; that the disorder of the liver began after that time, and at a time sufficiently remote from the date of the application to enable the disease to have its origin subsequent to the application. Upon this point you have heard the opinions of physicians, the value of which, of course, depends, as those opinions apply to either side of the case, upon the correctness of the facts assumed to be true in the hypotheses upon which their opinions were based. From all the testimony in the case, as I have already said, and in the light of the instructions given you by the court, you must determine whether at the time the application was made the deceased had, or had previously had, disease of the liver, and so whether or not the question in relation thereto was truthfully answered.

The last question to be considered is No. 11 in the medical examination, in which the applicant was asked whether he had ever had any severe injury or illness, and if so, whether it had had any perceptible effect on his constitution. To the first part of the question he answered, "Typhoid fever in 1866;" to the last part, "No." It is contended by the defendant that Mr. Goucher had previously had several attacks of severe illness, beginning in November, 1878, which ought to have been named in his answer to this question, and therefore that his answer was untrue. This is controverted by the plaintiff, who insists that those attacks were slight, temporary, and brief, not affecting his general health, and not entitled to be regarded as in any sense severe. You will remember the testimony of witnesses on the subject, and I shall not enter upon any review of it. You will notice that the question does not ask whether the applicant had ever had any illness, but whether he had ever had any severe illness; that is, (in the ordinary acceptation of the word,) serious or extreme. Clearly the term "severe" or "serious" illness does not mean slight, temporary physical disturbances or ailments, speedily and entirely recovered from, not interfering materially with the pursuit of one's avocation, producing no permanent effect on the constitution, and not rendering the insurance risk more than usually hazardous; and, in determining whether Mr. Goucher had previously had any severe illness, the jury will consider, under the evidence, whether the illnesses which he had, produced any ultimate effect on his health, longevity, or strength, and other similar considerations.

In this case the term "severe illness" was used by the parties in its common, ordinary sense. In the language of the court in *Ins. Co.* v. *Cheever*, Ins. Law J. April, 1882, p. 264, the object of the question was to elicit information which would be useful in determining whether it

would be prudent to take the risk of insuring his life. He was therefore asked by the question to disclose, and was bound to disclose, whether he had ever had, not such merely slight or temporary disorders or functional disturbances as had and ordinarily can have no effect upon his general health or the continuance of his life, but such severe illness as either may have had in fact, or ordinarily does have, such effect. The latter only would come within the meaning of the term "severe illness" as used in this case. * * * This is the meaning which you must attach to those words in deciding whether or not the applicant answered truthfully when he said, as he impliedly did, that he had not had any severe illness except typhoid fever in 1866. That meaning, however, includes not only such ailments and disorders as are calculated or tend directly to impair the general health or constitution, or produce death unless arrested, but also such as indicate, by their presence, history, or development, a vice in the constitution,—such, in other words, as are signs or warnings of danger to life or health, rather than direct causes of danger. That meaning does not include such slight temporary ailments as are calculated neither to affect nor threaten the general health or constitution, or such as do not ordinarily indicate the seeds in the system of serious disorder. *Ins. Co.* v. *Cheever*, *supra.* So, gentlemen, if any illness which Mr. Goucher had prior to. his application for membership in this association, other than typhoid fever in 1866, was merely temporary, and if its effects were temporary, and had entirely passed away before he made the application, and if it did not affect his health or shorten his life, then it was not a severe illness within the meaning of the question asked. The answer to the question in such case was substantially true, and the non-disclosure of such illness is no defense to the action. On the other hand, if the effects of any previous illness, other than typhoid fever, were not temporary, and remained when the application was made, or if such sickness affected the general health of Mr. Goucher, or was so serious that it might affect his health or shorten life, then it was such a severe illness as ought to have been mentioned, and its non-disclosure would defeat recovery, although the failure to mention it was not intentional or fraudulent.

Now, gentlemen, you will take this case, and, not deciding it upon conjecture or speculation, but weighing and considering all the testimony, and applying to the facts the principles which I have stated for your guidance, you will determine upon the evidence whether the questions referred to in the application of the deceased for membership in the association were truthfully answered by him. The burden of proof is upon the defendant to establish its defense, and to entitle it to your verdict it must satisfy you by a fair preponderance of the evidence that its defense is made out. If you are satisfied from the evidence, when considered in connection with the instructions given you, either that Mr. Goucher intentionally concealed any fact relating to his physical condition not stated in answers to other questions,

and with which the association ought to have been made acquainted, or that at the time of his application he had disease of the liver, or was not then in good health, or did not usually enjoy good health, or that he had previously had a severe illness other than typhoid fever, then your verdict should be for the defendant. On the other hand, if you find that there was not any such intentional concealment, and that when he made his application for membership he did not have disease of the liver, and was then in good health, and usually enjoyed good health, and had not previously had any severe illness other than typhoid fever, then your verdict should be for the plaintiff.

If you find the plaintiff entitled to recover, your verdict will be for the sum of $5,000, with interest at 7 per cent. from December 21, 1882.

Verdict for plaintiff.

---

The particular case brings up the question, what is meant by representations contained in applications for insurance, that the applicant is in the possession of good health? We may accept it as an established or recognized principle of the law that "good health" does not import a perfect physical condition. It is said that the epithet "good" is comparative, and does not ordinarily mean that the applicant is free from infirmities. "Such an interpretation would exclude from the list of insurable lives a large proportion of mankind. The term must be interpreted with reference to the subject-matter, and the business to which it relates. Slight troubles, not usually ending in serious consequences, and so unfrequently that the possibility of such result is usually disregarded by insurance companies, may be regarded as included in the term 'good health.'"[1] A standard authority says: "The statement that the person is in good health, does not mean that he is in absolutely perfect health, but only that he is in a reasonably good state of health. It does not mean that he has not the seeds of disorder about him, nor even that he is not subject to any infirmity, so long as it is not an infirmity likely to produce death."[2]

The question was raised at an early day, and Lord MANSFIELD told the jury the only question is whether he was in a reasonably good state of health, and such a life as ought to be insured upon common terms.[3] And in a later case the same learned judge said: "The imperfection of language is such that we have not words for every different idea, and the real intention of the parties must be found out by the subject-matter. By the present policy, the life is warranted to some of the underwriters *in health;* to others, *in good health.* And yet there is no difference in point of fact. Such a warranty can never mean that a man has not in him the seeds of some disorder. We are all born with the seeds of mortality in us. A man subject to the gout is a life capable of being insured, if he has no sickness at the time to make it an unequal contract."[4]

In *Peacock* v. *New York Life Ins. Co.*[5] the New York court of appeals said: "The word 'health,' as ordinarily used, is a relative term. It has reference

[1] May. Ins. § 295; citing Peacock v. N. Y. Life Ins. Co. 20 N. Y. 293, affirming S. C. 1 Bosw. (N. Y.) 338.
[2] Bliss, Life Ins. § 102.
[3] Ross v. Bradshaw, 1 Bl. 312; S. C.

Marsh. Ins. 770; Park, Ins. 933; Bliss, Ins. 144.
[4] Willis v. Poole, 2 Park, Ins. 650; S. C. May, Ins. 386.
[5] 20 N. Y. 293.

to the condition of the body. Thus, it is frequently characterized as perfect, as good, as indifferent, and as bad. The epithet 'good' is comparative. It does not require absolute perfection. When, therefore, one is described as being in good health, that does not necessarily or ordinarily mean that he is absolutely free from all and every ill which flesh is heir to."

In *Morrison* v. *Wisconsin Odd Fellows' Mut. Life Ins. Co.*[1] the supreme court of Wisconsin declares that an affirmation of "sound health" does not imply absolute freedom from bodily infirmity or tendency to disease. In his application the party insured stated: "I am, so far as I know, in sound health." It appeared in evidence that he had consulted a physician several times professionally, and complained of indigestion, flatulence, pain in the stomach after meals, and that the physician informed him that he had a touch of dyspepsia coming on. The court declared that this testimony failed entirely to show any misrepresentation as to the applicant's health. "It would be most unreasonable to interpret the term 'in sound health,' as used in contracts for life insurance, to mean that the insured is absolutely free from all bodily infirmities, or from all tendencies to disease. If that were its meaning, we apprehend but few persons of middle age could truthfully say they were in sound health."

In *Holloman* v. *Life Ins. Co.*[2] the court passed on the meaning of the question whether the applicant had had "any severe sickness or disease;" and, in so doing, it said: "This does not include the ordinary diseases of the country, which yield readily to medical treatment, and when ended leave no permanent injury to the physical system, but refers to those severe attacks which often leave a permanent injury and tend to shorten life. * * * The question is whether it was such a disease as often impairs the constitution and tends to shorten life, and which, if known, would have deterred the insurer from taking the risk without further examination and information." It appeared that the applicant had had chronic diarrhea or affection of the bowels, which trouble continued for two or more months. This was some two or three years before she made her application for insurance, and in her application she did not state this fact. It was held not to invalidate the policy.

In *Masons' Benevolent Society* v. *Winthrop*,[3] the court construed the matter as follows: "Again, what is to be understood by 'serious illness?' If any sickness which may terminate in death, then it must embrace almost every distemper in the entire catalogue of diseases. To give such an interpretation to this expression would, we have no doubt, defeat a recovery in a large majority of the certificates issued by the society. The true construction of the language must be that the applicant has never been so seriously ill as to permanently impair his constitution, and render the risk unusually hazardous. It seems to us that this is the only reasonable construction that can be given to the language. It is reasonable, and is fair to both parties, and works no hardship or injustice to any one, whether the answers are warranted to be true, or only as a fair statement of facts honestly and truly given as understood by the applicant."

In *Boos* v. *World Mut. Life Ins. Co.*,[4] the applicant, in answer to the question whether he had had "any severe sickness or disease," answered, "No." The evidence showed that he had had an attack of pneumonia, which lasted 10 days, and that he had had a sunstroke. It was held that the court was not bound to decide, as matter of law, that either pneumonia or a sunstroke was a severe sickness or disease, within the meaning of the question, and that the question of a breach of the warranty was one of fact for the jury.

In *Fitch* v. *American Popular Life Ins. Co.*[5] the application contained an

---

[1] 18 N. W. Rep. 13.
[2] 1 Wood, C. C. 674.

[3] 85 Ill. 537.
[4] 64 N. Y. 236.

[5] 59 N. Y. 571.

inquiry whether the deceased "had ever had any illness, local disease, or injury in any organ," and he answered, "No." The evidence showed an omission on his part to mention a temporary injury to the eye, by sand having been thrown into it, which had produced an inflammation six years before the policy was applied for, and which was then cured. The court held that this fact was not conclusive evidence of fraud, or of breach of the warranty, sufficient to avoid the policy, and said that, if the omission was of any import whatever, it was, at most, evidence of fraud to go to the jury.

In *Price* v. *Phœnix Mut. Life Ins. Co.*[1] the following question was required to be answered by the applicant: "Has the party had, during the last seven years, any severe sickness or disease?" and the applicant had answered, "No." The insurance company, in its answer to the plaintiff's complaint, claimed that the life insured had had, within the seven years referred to, "chronic gastritis." And evidence was introduced which tended to show that such life had had gastritis. This was held not to meet the case. "Unless chronic gastritis and gastritis are synonymous," said the court, "as to which there is no judicial presumption nor testimony, the evidence was not within the issues, so that the false representation charged was not proved. In addition to this consideration, we are not free from doubt as to whether gastritis was shown to be 'a severe sickness or disease.' We can take no judicial cognizance of its character."

In the same Minnesota case it appeared that one of the questions which the applicant was required to answer was whether he "had ever had any of the following diseases," naming several, and, among others, that of rheumatism. He answered, "Never." The evidence in the case tended to show that he had had subacute rheumatism. And there was also evidence in the case tending to show that subacute rheumatism was not the disease of rheumatism in the ordinary understanding of that term; but there was also evidence tending to show that, technically and in medical parlance, subacute rheumatism was the disease of rheumatism. In commenting on this part of the case the court said: "The rheumatism referred to in the question is the disease of rheumatism. Any rheumatic affection not amounting to the *disease* of rheumatism is not comprehended in its terms, any more than the spitting of blood occasioned by a wound of the tongue or the extracting of a tooth is the *disease* of 'spitting blood,' mentioned in the same question. The life insured had the right to answer the question upon the basis that its terms were used in their ordinary signification. If there was any ambiguity in the question, so that its language was capable of being construed in an ordinary as well as in a technical sense, the defendant can take no advantage from such ambiguity."

In *Powers* v. *Northeastern Mut. Life Ass'n*[2] it appeared that among the questions asked was whether the applicant has now or has ever had disease of the heart, and that he answered, "No." By the terms of the policy and application the parties agreed that the truthfulness of the applicant's answers to the questions propounded should be the basis upon which the validity of the policy was to stand. At the trial the jury brought in a special verdict, finding that the applicant had disease of the heart at the time of his application, and also that he did not and would not reasonably have been expected to know that he had that disease. The court held the policy void. It said: "It is wholly immaterial whether the applicant knew of the existence of the disease, because he agreed absolutely that it did not exist. Nor is it any answer to say that the question is a scientific one, and a layman might easily be deceived into a false answer. Scientific or simple, the applicant took the risk of the answer. If he had answered that he had no knowledge that the disease existed, the finding of the jury might affect the result."

In *Singleton* v. *St. Louis Ins. Co.*[3] it appeared that one of the questions

[1] 17 Minn. 497, 518.     [2] 50 Vt. 630.     [3] 66 Mo. 63; S. C. 27 Amer. Rep. 321.

asked was, "Has the party had, since childhood, consumption, bronchitis, spitting of blood, * * * and, if so, which?" To which question the applicant answered, "No." The court held that no error was committed in permitting physicians to testify that "spitting of blood" was a medical term, meaning spitting of blood from the lungs exclusively. "Without any evidence of the meaning of that term, the court might properly have instructed the jury that spitting of blood, in consequence of a drawn tooth or a cut on the gums, was not meant by that term; and yet, if Anderson had spit blood from such trivial causes, literally, his answer to the question would have been false. There was, therefore, a propriety in the admission of evidence of the meaning of the term. There is something ambiguous in the term 'spitting of blood.' There is room for interpretation. Literally, the meaning is spitting blood, whether from the teeth, gums, or lungs; but it would be absurd to hold that it was used in that sense in the application." The question and answer may relate, not to the applicant's own health, but to the health of a third person. Such an inquiry and answer must necessarily be understood in a general and not in a strict sense. An applicant, in answering such inquiries, can, ordinarily, only answer from physical appearances and indications. "One who is not a doctor, and speaks not of himself, but of a third person, necessarily gives rather an opinion founded on observed facts, than an absolute and accurate fact, when he describes the health of such person as good. He means, and is understood to mean, that the individual inquired about has indicated, in his action and appearance, no symptoms or traces of disease, and to the observation of an ordinary friend or relative is, in truth, well."[1] In this case the court sustained an instruction charging the jury that if, from all the appearances, the person was in good health, so that everybody would so pronounce him, and there was nothing to indicate to any person that he was not in good health, that the warranty was not broken, although, in fact, the germs of a lurking and hidden disease might exist.

In *Hartford Life & Annuity Ins. Co.* v. *Gray*[2] the insured answered "No" to the question whether either of his parents, brothers, or sisters ever had pulmonary, scrofulous, or other constitutional or hereditary taint. It was held that his answer assumed his knowledge of the fact, and would preclude the plaintiff, in an action on the policy, from alleging a want of knowledge on the part of the insured as an excuse for not answering correctly.

In *Ins. Co.* v. *Gridley*,[3] the applicant, in reply to a question whether certain of his relatives had any hereditary disease, answered, "No hereditary taint of any kind in family, on either side of house, to my knowledge." The company proved that an uncle had died in an insane asylum more than 20 years before the date of the application. The supreme court of the United States held the policy good, and that, to have avoided it, it was necessary that the company should have shown that the applicant knew of the insanity of his uncle, and also that he knew that insanity was hereditary.

In *Grattan* v. *Metropolitan Life Insurance Co.*[4] the facts were as follows: The sister of the applicant died of consumption before he made the application. The fact was known to the insured, but in the examiner's report it was stated that he did not know the cause of her death. Appended to this report was the certificate of the insured, signed by him, in these words: "I hereby declare that I have given true answers to all questions put to me by the medical examiner; that they agree exactly with the foregoing; and that I am the same person described in the accompanying application, and whose signature is appended to declaration and warrant herewith." The insured contended that he answered truthfully, and that the medical examiner wrote down the falsehood. It did not appear that the applicant signed in blank.

[1] Grattan v. Metropolitan Life Ins. Co. 92 N. Y. 280.
[2] 91 Ill. 159.
[3] 100 U. S. 614.
[4] 92 N. Y. 282.

But the evidence tends to show that the examiner received a true answer, and either inadvertently or fraudulently wrote down a false one; that the applicant did not read the answers as written, neither were they read over to him by the examiner; that the applicant signed the examiner's report without reading it and through natural confidence and trust in the examiner. Upon such facts the company would be estopped by the fraud of its agent.

For other cases in which it has been held that the applicant is not to be prejudiced by the fraud or mistake of the agent in writing out the application, reference may be had to the cases cited below.[1]

We note in this connection a principle often laid down, that to avoid a policy of life insurance upon the ground of misrepresentation, the misrepresentation must, in the absence of fraud, be in respect to some circumstance or fact material to the contract; but that, on the other hand, a warranty must be literally true, whether the fact warranted be material or not.[2] In *Campbell* v. *New England Mut. Life Ins. Co.*[3] it is laid down by the supreme court of Massachusetts that the application is in itself collateral merely to the contract of insurance. "Its statements, whether of facts or agreements, belong to the class of representations. They are to be so construed, unless converted into warranties by force of a reference to them in the policy, and a clear purpose, manifest in the papers thus connected, that the whole shall form one entire contract." But in *Knecht* v. *Mutual Life Ins. Co.*,[4] recently decided in Pennsylvania, the supreme court of that state says that the authorities are by no means uniform on the question whether the declarations of the insured as to existing facts in his application constitute a warranty; and it is laid down that knowledge of the agent of the falsity of a warranty cannot relieve the insured or his representatives from the consequences of the breach.[5]

HENRY WADE ROGERS.

[1] McCall v. Phœnix Mut. Life Ins. Co. 9 W. Va. 237; S. C. 27 Amer. Rep. 558. In Lueders v. Hartford L. & A. Ins. Co. 12 Fed. Rep. 465, it was held that where an authorized agent of an insurance company has examined an application, and has undertaken to fill in the applicant's answers, the applicant has a right to presume that his answers have been written down as given; and that if he has answered all questions truly, and signed the application under the impression that his answers have been correctly reduced to writing, a policy issued on the faith of the application will not be invalidated by false answers inserted in the application by the company's agent without the knowledge of the applicant. In Fletcher v. N. Y. Life Ins. Co. 11 Fed. Rep. 377, it appears that, to have this effect, the applicant must sign under the impression that it contains his answers as given. See Ryan v. World Mut. Life Ins. Co. 41 Conn. 168, where the agent wrote false answers, and

applicant signed without reading, and policy held void.

[2] See Barteau v. Phœnix Mut. Life Ins. Co. 67 N. Y. 595; Higbie v. Guardian Mut. Life Ins. Co. 53 N. Y. 603; Foot v. Ætna Life Ins. Co. 61 N. Y. 576; Fitch v. A. P. L. Ins. Co. 59 N. Y. 557; Archibald v. Mut. Life Ins. Co. 38 Wis. 542; Carpenter v. American Ins. Co. 1 Story, 62; Alston v. Mechanics' Mut. Ins. Co. 4 Hill, (N. Y.) 334; Miller v. Mutual Benefit Life Ins. Co. 31 Iowa, 226; Daniels v. Hudson River Fire Ins. Co. 12 Cush. (Mass.) 416; Campbell v. New England Mutual Life Ins. Co. 98 Mass. 389; Illinois Masons' Benevolent Society v. Winthrop, 85 Ill. 537.

[3] 98 Mass. 389, 391.

[4] 90 Pa. St. 118, 121.

[5] Barteau v. Phœnix Mut. Life Ins. Co. 67 N. Y. 595; Chase v. Hamilton, 20 N. Y. 52; Ripley v. Ætna Ins. Co. 30 N. Y. 136; Brown v. Cattaraugus Mut. Ins. Co. 18 N. Y. 387; Foot v. Ætna Life Ins. Co. 61 N. Y. 576.