KEIPER v. EQUITABLE LIFE ASSUR. SOCIETY OF UNITED STATES.

(Circuit Court, E. D. Pennsylvania. February 1, 1908.)

No. 107.

1. COURTS—FEDERAL COURTS—TRIAL—JUDGMENT NON OBSTANTE VEREDICTO.

In trial of an action at law in a federal court, sitting in Pennsylvania, where defendant's request for binding instructions is refused, defendant may file a motion for judgment non obstante veredicto, under Pa. Act 1905 (P. L. 286), providing that, whenever a point requesting binding instructions has been declined, the party presenting it may move the court for judgment non obstante veredicto on the whole record.

[Ed. Note.—State laws as rules of decision in federal courts, see notes to Wilson v. Perrin, 11 C. C. A. 71; Hill v. Hite, 29 C. C. A. 553.]

2. INSURANCE—BREACH OF WARRANTY—SERIOUS ILLNESS—SUPPRESSION OF FACTS—FRAUD—QUESTIONS FOR JURY.

In an action on a policy, whether insured ever had any serious illness prior to that which caused his death; whether he suppressed material facts when he made out his application; and whether he fraudulently failed to disclose the existence of any illness or suppressed any information with intent to deceive the insurer—held for the jury.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 28, Insurance, §§ 1735, 1738, 1759.]

3. SAME—SCOPE OF WARRANTY.

Where an application for insurance, in which insured stated that he had not had any serious illness or disease other than those incident to childhood, was signed by him, and incorporated into the contract, which provided that all statements and answers therein were warranted to be true, insured thereby warranted that he had never had any serious illness or disease except those incident to childhood.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 28, Insurance, §§ 681–696.]

4. SAME—"SERIOUS ILLNESS."

The term "serious illness," in an application for life insurance means such an illness as has, or ordinarily does have, a permanently detrimental effect on the system, or renders the risk unusually hazardous, but does not include any sickness which may terminate in death, provided its effect on the individual has not been such as to permanently impair his constitution.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 28, Insurance, §§ 687, 689.

For other definitions, see Words and Phrases, vol. 7, p. 6421.]

5. SAME—MISSTATEMENT—BREACH OF WARRANTY—MATERIALITY—FRAUD—STATUTES.

Pa. Act June 23, 1885, § 1 (P. L. 134), provides that, whenever an application for life insurance contains a clause of warranty of the truth of the answers therein contained, no misrepresentation or untrue statement made in good faith by the applicant shall work a forfeiture or be a ground of defense in any suit brought on any policy of insurance issued on the faith of such application, unless such misrepresentation or untrue statement relates to some matter material to the risk. *Held*, that where the misstatement is made in bad faith, and for the purpose of misleading the insurer, the policy will be avoided under such section, though the fact inquired about is immaterial; but if the misstatement has been made in good faith, it will not avoid the policy, though untrue, unless it was material to the risk.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 28, Insurance, §§ 548, 549.]

6. TRIAL—REQUEST TO CHARGE—FORM—"I DIRECT YOU TO FIND A VERDICT FOR DEFENDANT."

In an action on an insurance policy, defendant requested an instruction that if prior to October 10, 1906, insured had any serious illness or disease of an organic type, accompanied by circumstances which would naturally lead a reasonable man to suppose that he was afflicted with an illness or disease that might impair his health, and must thereby necessarily have been impressed on his memory, it was his duty to disclose the same to the insurer, and his failure to do so warrants the jury in finding, and "I direct you to find, a verdict for defendant." *Held*, that the quoted clause was an implied direction to the jury to make an affirmative finding as to the facts stated in the instruction, which was therefore properly refused.

At Law. On motion and reasons for a new trial and for judgment non obstante veredicto.

Lewis B. Mathias, Wm. L. Kinter, and J. Claude Bedford, for plaintiff.

George D. Hay, B. Gordon Bromley, and Thomas De Witt Cuyler, for defendant.

HOLLAND, District Judge. This suit was instituted on a policy of life insurance issued by the defendant company on December 28, 1906, on the life of John F. Finney. It is the company's form of 20-

year 5 per cent. gold bond, and the claim of the plaintiff, under a certain condition therein contained, is for the sum of $32,500. The defense is (1) that decedent suffered from serious illness or disease other than those incident to childhood; (2) he concealed information in regard to his past history and health which was material to the risk; (3) and that he knowingly concealed these facts with the intention of deceiving the defendant.

The decedent was examined for insurance by Dr. Caskin, the defendant's physician, on October 9, 1906, who asked him all the questions contained in the company's "Medical Examiner's Report," and noted his answers, all of which were read to Finney before he signed it. In this examination he is reported to have answered that he never was afflicted with malaria, loss of consciousness, indigestion, jaundice, or any serious disease, injury, or infirmity. He also answered that he had not been, either directly or indirectly, concerned in the manufacture or sale of any kind of alcoholic beverage, and had never traveled in tropical countries, and that he had always lived in Pennsylvania. Subsequently, on October 10, 1906, the insured signed a formal written application for the insurance, which contained, inter alia, the following statement:

"I hereby agree that this subscription, and the contract of sale hereby applied for taken together, shall constitute the entire contract between the parties hereto; that all the statements herein are warranted to be true; that this contract shall not take effect until the first installment has been paid during my good health. I have not been declined or postponed by any life company or received a policy different in form from the one originally applied for, nor have I been intemperate, or had any serious illness or disease, except diseases incident to childhood, and there is no history of consumption or insanity in my family; i. e., among parents, brothers or sisters, uncles or aunts."

The application also contained the following:

"Note.—If applicant has ever been declined or postponed by any life company, or received a policy different from the form originally applied for, or been intemperate, or had any serious illness or disease other than childhood diseases, or if there is any history of insanity or consumption in applicant's family—among parents, brothers, sisters, uncles or aunts—state particulars here."

To this there was no answer. The policy was preceded by a two months and eighteen days term assurance which issued as of the date of the application, upon which the premium of $298.23 was paid. On December 28, 1906, a policy issued to which was attached the foregoing application, and a further premium of $2,524.74 was paid. The Medical examiner's report, however, was not so attached. The insured died on March 18, 1907, of what was termed in the proof of death, "Acute gastritis and collapse of central nervous system."

At the trial of the case it appeared (1) he had malaria fever in 1875; (2) he had lived and traveled in Peru in 1875 and 1876 where he had an attack of chagres fever; (3) he conducted a restaurant in 1878–1880 in connection with which liquors were sold; (4) he suffered from pains in his stomach resulting from indigestion in 1888 and 1889; (5) and again in 1897, 1901, and 1904 he had attacks of indigestion and neuralgia of the stomach, the most severe of which occurred in 1901

when he became unconscious for some time and the attending physician was unable to diagnose the real trouble, but there was a complete recovery. The decedent did not inform the insurance company of these facts, nor did it know of their existence until after his death. It further appeared that Finney, with the exception of being troubled with what one of the physicians called a lazy stomach, which at its best was slow in the digestion of food, and which when overtaxed caused him a great deal of pain and suffering, was a vigorous and healthy man. He was short and of stocky build, and on the 9th day of October, 1906, the examiner of the defendant company found him to be in perfect health, and after a careful examination, especially directed to the condition of the vital organs and to the general health, so reported to the company before the policy was issued. The application was made part of the policy, as required by the Pennsylvania act of May 11, 1881, § 1 (P. L. 20). It contained the statement, which is warranted to be true, as we have seen, that he (the decedent) never "had any serious illness or disease except those incident to childhood, and there was no history of consumption or insanity in his family; that is, among parents, brothers or sisters, uncles or aunts."

In the charge, at the trial of the cause, the court submitted three questions of fact to the jury, upon which they were requested to pass: (1) Did the insured ever have any serious illness prior to that which caused his death? (2) Did the insured in his answer to the questions in the medical examination, or his warranty in his application, which was incorporated in the policy, that he had never had any serious illness, suppress any fact material to the risk? (3) Even if insured did suppress no fact material to the risk, did he fraudulently fail to disclose the existence of any illness or suppress any information with the intent to deceive the defendant? The jury answered all these inquiries in the negative, and returned a verdict in favor of the plaintiff for the amount claimed. A motion and reasons for a new trial were duly filed as well as a motion for judgment non obstante veredicto. The latter motion is authorized by the Pennsylvania Act of 1905 (P. L. 286), which provides that, whenever a point requesting binding instructions has been declined, the party presenting it may move the court for judgment non obstante veredicto upon the whole record.

The defendant's first point was refused. It was a request for binding instructions as follows: "Under all the evidence in the case the verdict must be for the defendant." For reasons hereinafter stated, it will appear that the questions as to the seriousness of prior ailment, the materiality of any concealed information, and the intent of the decedent in failing to state this fact, if not material, were properly submitted to the jury, and this motion must be overruled.

There are 19 reasons assigned why the defendant should have a new trial, 8 of which are errors alleged to have been committed by the court in charging the jury, 7 in affirming plaintiff's points, and 4 in refusing to affirm certain points of the defendant. The errors assigned to the charge of the court raise the single question as to whether it was the duty of the court, as a matter of law, to determine these three questions in favor of the defendant instead of submitting them to the jury,

but the facts and circumstances in this case require that this question be resolved against its contention. All three were properly referred to the jury, as will appear upon a reference to them in their order.

First. Was the defendant entitled to have the court give binding instructions to the jury to find that the decedent had, prior to the issuing of the policy, "serious illness and disease other than those incident to childhood"? If the jury should have been so instructed, then this defendant would be entitled, under the Pennsylvania act, to judgment in its favor notwithstanding the verdict. The application for the policy in question, signed by the decedent, has been incorporated into and made part of the contract, and "all the statements and answers therein are warranted to be true." He therefore warranted, as contained in that application, that he had never "had any serious illness or disease except those incident to childhood," and the defendant contends that the evidence adduced at the trial, together with all the inferences properly drawn from it, is insufficient to support a verdict for the plaintiff, so that the court was bound to direct a verdict in its favor. Hews v. Equitable Life Assurance Society, 143 Fed. 850, 74 C. C. A. 676. The decedent had warranted as true that he had not suffered from any "serious illness or disease except those incident to childhood," and by this he is bound, but the plaintiff urges that the evidence establishes the truthfulness of this warranty. The evidence to establish that the decedent had been seriously ill for a long time prior to the issuing of the policy is substantially as follows: That he had chagres fever in 1875 while traveling in Peru, South America; attacks of indigestion or dyspepsia in 1888, 1889, 1895, and 1897; and a severe stomach trouble, resulting in a loss of consciousness, in 1901. Dr. Hughes, a specialist of Philadelphia, was called in, who said that "Finney was partially conscious only," "almost unconscious," and "in an exceedingly weak state," "thought he was going to die," "symptoms were pain in the abdomen," "collapse with extreme weakness and almost complete unconsciousness." "The pulse was weak; he was rather white; a little yellowish; there was a suspicion of jaundice;" "the whites of his eyes were colored a little yellow."

"Q. Did you arrive at any conclusion as to what the cause of his trouble was? A. I thought the first time I saw him that it was probably hemorrhagic pancreatitis. Hemorrhagic pancreatitis is a condition in which you find after death that the pancreas, which is an organ lying back of the stomach in the upper part of the abdomen, is infiltrated everywhere with blood. The condition very usually causes death. When I saw him the second time I doubted the correctness of the original diagnosis, largely because he had improved. At that second examination I still thought there probably was some obscure disease of the pancreas, but probably not of a hemorrhagic type. Q. Was his condition at the time of your first visit such as to indicate to your mind a possible fatal termination? A. I thought that there would be a fatal termination. * * * Q. As I understand you, he did not have this (hemorrhagic pancreatitis)? A. I presume he did not have it because he recovered. There have been reported cases in which recovery had ensued following the disease. That may be the result of faulty observation, or there may be possibly a recovery from it. Q. Your judgment is there is no recovery from it? A. I have never seen a case that I knew to recover. * * * "

The witness further stated that "I am not certain it was not (hemorrhagic pancreatitis). It might have been and there might have been

a recovery." Dr. Hughes further stated that he had no personal knowledge as to whether Finney recovered from this illness, but that he (the doctor) thought that Finney "could have recovered perfectly from any condition of the pancreas, for instance, which would not kill him at the time; that is, there would be a possibility of complete recovery." Dr. Brown, his family physician, called this attack "gastric neurosis," which he said meant simply "nervous indigestion," and it was shown that he died March 18, 1907, and Dr. Brown, his family physician, certified that death resulted from "acute gastritis and collapse of the central nervous system." He explained that by gastritis he meant a general disturbance of gastric affection, and in this particular instance to mean that Finney had a "lightening up of those old gastric affections which he had been suffering from for a number of years." "It was a lightening up, through some special cause, increasing the severity of the symptoms."

On the part of the plaintiff evidence was produced to show that the decedent was a stout and vigorous man, of stocky build, and of good, general health. Dr. Robinson, of Pottsville, testified that these attacks of dyspepsia were simply functional derangements, brought about by errors of diet, and that after they passed Finney immediately recovered his general good health. He had on January 24, 1904, made application to the New York Life Insurance Company for a policy of $5,000, which was issued to him, in which he stated to the question, "What illnesses, diseases, or accidents have you had since childhood?" that he had "Gastritis, one attack in October, 1901, duration six weeks. The attack was a severe one. Results, perfect recovery." And to the question, "How long since you consulted or have had the care of a physician, if so, for what ailment? Name and address of physician?" to which he answered, "One month ago. Indigestion, lasting a few days. Dr. Brown, 49th & Chester avenue." Dr. Bobb was the medical examiner for the New York Life, and, after receiving Finney's answers to all questions, made a thorough examination of him, the result of which he testified to be that he found heart, lungs, stomach, and kidneys in good condition, and the pulse normal, and that Finney at that time was a good risk, and this company insured him. Dr. Caskin was the medical examiner for the defendant company, and, after recording the answers of Finney to the questions propounded to him, made for himself a physical examination of the decedent, the result of which he certified to the company, showing that all his vital organs were sound and healthy, and that an examination of his pupils and reflexes showed there was no disturbance of his nervous system, and further certified that "compared with the average of lives of the same age and sex, the chances of life in this subject seemed to be first-class." Dr. Brown, his family physician, who attended the insured throughout his illness of 1901, testified that his health was even better after his illness than before, and that he had increased in weight, and led a very strenuous life down to within a few days before his death.

Notwithstanding this conflict of evidence on the question of whether or not the decedent ever had any serious illness other than those

incident to childhood, prior to the date of the policy, the defendant contends it was entitled to binding instructions in its favor. It might even be doubted whether it would be entitled to such a disposition of the case on the strength of a most favorable view of its own evidence. It may be pancreatitis may be adjudged as a serious illness, as a matter of law, but Dr. Hughes, while not certain, gives it as his judgment that the decedent in 1901 had not suffered from that disease. The weight of the evidence is to the effect that he suffered from nervous indigestion and dyspepsia at times, as a result of indiscretions in diet, and this, as a matter of law, cannot be held to be a serious illness. McClain v. Provident Life Assurance Association of New York, 110 Fed. 80, 49 C. C. A. 31. But when taken in conjunction with the evidence of the plaintiff tending to show that no sickness from which the decedent suffered prior to the date of the policy was serious other than those incident to childhood, it was clearly a case to be submitted to the determination of a jury, upon which point the jury was instructed as follows:

"The term 'serious illness' in an application for a life policy is such an illness as is likely to impair permanently the constitution and render the risk more hazardous. Did these troubles which he had impair permanently his constitution and render the risk more hazardous? Was his stomach or digestive power, the digestive power of the stomach, good and healthy, or was it of a kind that could be cured of the acute and troublesome condition? Or was there any danger, by reason of its lazy condition, of it becoming impaired by slight over-indulgence? Was it of that character which really was permanent? Was it of that character which was incurable? All these you will pass upon, and you will look to the evidence for the purpose of saying whether or not these attacks were temporary or permanent, whether they were serious or whether they were only, as the plaintiff says, a slight indisposition, as the result of slight and at times over-indulgence? The court has also said that the term 'serious illness,' as used in applications for a life policy, as to the question whether the applicant ever had any serious illness, means a grave, important and weighty trouble. In the Century Dictionary the words 'serious illness' are defined as attended with dangers giving rise to apprehension. Were the illnesses, or was any illness from which he suffered, dangerous, giving rise to apprehension? And again, it has been said that the term 'serious illness,' as used in an application for life insurance, means an illness that permanently impairs the health of the applicant, and does not mean an insignificant illness. The term does not include every sickness which may terminate in death, as such an interpretation would cause it to embrace almost every distemper in the entire category of disease."

The term "serious illness" has been construed to mean such an illness as has, or ordinarily does have, a permanent detrimental effect on the system, or renders the risk unusually hazardous. Cooley's Brief on Law of Insurance, vol. 3, p. 2112. What is to be understood by "serious illness"? If any sickness which may terminate in death, then it must embrace almost every distemper in the entire catalogue of diseases. To give such an interpretation to this expression, would, we have no doubt, defeat a recovery in a large majority of the certificates issued by the society. The true construction of the language must be that the applicant has never been so seriously ill as to permanently impair his constitution, and render the risk unusually hazardous. This was said in sustaining the verdict of the jury in Illinois Masons' Benevolent Society v. Winthrop, 85 Ill. 537. Before any

temporary ailment can be called a disease, it must be such as to indicate a vice in the constitution, or be so serious as to have some bearing upon general health or the continuance of life, or such as, according to common understanding, would be called a disease. When the applicant says that he has never had any serious illness, the courts will construe the meaning to be that he had never been so seriously ill as to permanently impair his constitution and render the risk unusually hazardous. Rand v. Life Insurance Society, 97 Tenn. 291–295, 37 S. W. 7. If any illness which Mr. Goucher had prior to his application for membership in this association, other than typhoid fever in 1866, was merely temporary, and if its effects were temporary and had entirely passed away before he made the application, and if it did not affect his health or shorten his life, then it was not a severe illness within the meaning of the question asked. The answer to the question in such case was substantially true, and the nondisclosure of such illness is no defense to the action. Goucher v. Northwestern Traveling Men's Association (C. C.) 20 Fed. 596. It was for the jury to say whether or not the ailments from which the decedent suffered were serious within the meaning of his warranty. In Boos v. World Mutual Life Ins. Co., 64 N. Y. 236, it was left for the jury to pass upon the question as to whether an attack of pneumonia, which lasted 10 days, and a sunstroke suffered by the applicant, were serious sicknesses or diseases; and in Black v. Travelers' Insurance Co., 121 Fed. 732, 58 C. C. A. 14, 61 L. R. A. 500, the insured had received a gunshot wound in the back of his head by which the external table of the skull was fractured, and a piece about one-half inch square taken out, on the strength of which he had received a pension from the government, which had afterward been increased on account of alleged resulting vertigo and impaired vision, the Circuit Court of this district held that, upon a warranty by the insured that he had never had any bodily or mental infirmity, the question was one for the jury to determine. Smith v. Metropolitan Life Ins. Co., 183 Pa. 504, 38 Atl. 1038, and Barnes v. Fidelity Mutual Life Association, 191 Pa. 618, 43 Atl. 341, 45 L. R. A. 264, are Pennsylvania Supreme Court cases to the same effect.

Second. The foregoing discussion bears directly on the second question submitted to the jury in the case at bar, viz., whether the insured in his answers to the questions in the medical examination and warranty that he never had any serious illness suppressed any fact material to the risk? The jury on this point were charged that if any of the ailments, including the illness of 1901, were serious, they were material, and, if insured had suppressed the material fact, the plaintiff could not recover. A verdict for the plaintiff is equivalent to a finding that no facts were suppressed material to the risk. There was evidence to warrant the jury in so finding, and it was properly submitted to them.

The evidence shows that on December 9th, 1898, decedent applied to the Fidelity Mutual Life Insurance Company for a $5,000 policy, stating in answer to the questions in the medical examination that he had chagres fever in 1875, and dyspepsia on several occasions, giving the name of Dr. Robinson, of Pottsville, as the attending physician. In

the same application he stated his ownership of a restaurant and bar. With this information in its possession, the Fidelity Mutual Life Insurance Company issued to Finney a policy for $5,000, and upon a similar application, dated May 11, 1899, containing the same answers to these questions, issued to him a second policy for $5,000. On March 14, 1906, the decedent applied to the Provident Life & Trust Company for a policy for $5,000. In the answer to a question in the application as to whether he had ever been seriously ill, or had typhoid, typhus, yellow, remittent or intermittent fever, rheumatism, rupture, etc., "dyspepsia or impaired digestion to any extent," Mr. Finney replied "No; except yellow fever in early manhood." Subsequently, the policy having been issued upon his application, Finney examined the copy of the medical examination attached to the policy, and addressed the following letter to the Provident Company:

"Gentlemen: I desire to have answers to certain questions on the back of my policy, No. 125,032, corrected as follows: Question No. 7 to read 'No, excepting an attack of neuralgia five years ago, and fever in early manhood.' Question No. 17, to contain the names of Dr. Brown and Dr. Donald Hughes. Question No. 18 to read, 'New York Life $5,000, and Fidelity $5,000.' Truly, John F. Finney."

This letter was indorsed by the Provident Company, "Risk approved as before, 3 mo–27th, 1906, C. H. W." There were four additional policies applied for in the Provident Life & Trust Company on April 20, 1906, each for $2,500, making a total of $10,000. The answers in the four applications to these policies contained the modified answers, as indicated by the above quoted letter, and the policies were issued on these four additional applications. It will thus be seen that the Fidelity Mutual Life Insurance Company, with the knowledge in its possession that the decedent had suffered from chagres fever in 1875, had frequent attacks of dyspepsia from errors of diet, had traveled in Peru, South America, and that he had been the owner, for a short time, of a restaurant with a bar attached, did not regard all this information material to the risk, as they issued their policy at the usual rate to him on December 9, 1898, for $5,000, and the Provident Life & Trust Company, with the knowledge of his gastric troubles, and the attention he received from Dr. Hughes and Dr. Brown in 1901, which was the most severe attack, also regarded these ailments as immaterial, and issued policies to him to the extent of $15,000.

In a well-considered opinion in Penn Mutual Life Insurance Co. v. Mechanics' Bank, 72 Fed. 413, 19 C. C. A. 286, 38 L. R. A. 33, 70, Judge Taft said:

"A fair test of the materiality of a fact is found, therefore, in the answer to the question whether reasonably careful and intelligent men would have regarded the fact communicated at the time of effecting the insurance as substantially increasing the chances of the loss insured against. The best evidence of this is to be found in the usage and practice of insurance companies in regard to raising the rates or in rejecting the risk on becoming aware of the fact. If the rates are not raised in such a case, it may be inferred that reasonably careful men do not regard the fact as material. If the rates are raised, or the risk is rejected, then they do."

The evidence of the action of the other companies upon receiving the information as to these prior ailments was submitted in the case, and it

alone was sufficient to carry the question of its materiality to the jury. In addition to this, there was considerable evidence on the part of the plaintiff as to his general good health, and the temporary condition of the stomach troubles from which he suffered. But, at any rate, two of the important insurance companies of the country did not regard these ailments as material to the risk. This fact, together with the other evidence in the cause as to its materiality, clearly made it a question for the jury, and their finding against the materiality was amply justified.

The Pennsylvania Act of June 23, 1885, § 1 (P. L. 134), on the question of materiality is as follows:

"Whenever the application for a policy of life insurance contains a clause of warranty of the truth of the answers therein contained, no misrepresentation or untrue statement in such application, made in good faith by the applicant, shall effect a forfeiture or be a ground of defense in any suit brought upon any policy of insurance issued upon the faith of such application, unless such misrepresentation or untrue statement relate to some matter material to the risk."

Under this act, if the matter is not material to the risk and the statement is made in good faith, although it is untrue, it shall not avoid the policy. March v. Metropolitan Life Ins. Co., 186 Pa. 629, 40 Atl. 1100, 65 Am. St. Rep. 887. The question of the materiality of the statements alleged to be false is for the jury under the Pennsylvania act above referred to. This has been repeatedly asserted by the Supreme Court of that state. March v. Life Ins. Co., supra; Keatley v. Ins. Co., 187 Pa. 197, 40 Atl. 808; McClain v. Provident Saving Association of New York, supra.

Third. It is strenuously urged that, whether the ailments above alluded to were serious and material or not, the decedent suppressed information in regard to them with a fraudulent intent of withholding this information in order that he might procure the policy on which the suit was brought, and that this was so clearly established by the evidence in the cause that it was the duty of the court to so decide. As construed by the Supreme Court of the state in March v. Metropolitan Life Ins. Co., supra, and the Circuit Court of Appeals in the Sixth Circuit in Penn Mutual Life Ins. Co. v. Mechanics' Savings Bank & Trust Co., 72 Fed. 413, 19 C. C. A. 286, 38 L. R. A. 33, 70, reaffirmed by the same court on a rehearing in 73 Fed. 653, 19 C. C. A. 316, 38 L. R. A. 33, 70, the Pennsylvania act of 1885 leaves open to judicial investigation, in the ordinary way, the question whether any fact concerning which inquiry was made, and an untrue answer given was material to the risk. If found to be material, the policy will be avoided, whether the untrue answer was made in good faith or not. If found not to be material, then the breach of warranty will work no prejudice to the insured, if the answer was given in good faith; but if given in bad faith, and for the purpose of misleading the company, then the policy will be avoided, notwithstanding the immateriality of the fact inquired about.

Under the act, untrue answers, made in good faith, as to immaterial matters, even in the warranty or where it is expressly stipulated to be part of the contract, will not avoid the policy; but in this case the un-

true answers, set up for the purpose of avoiding the policy, were not incorporated in the contract, nor were they warranted as true, nor was a copy of the answers attached to the policy so that the decedent could have examined them for the purpose of ascertaining whether they were in accordance with his answers made to the medical examiner. They are answers made by the insured to the defendant's medical examiner who wrote them down (as he testified at the trial) "disregarding things that in his judgment had no bearing on the risk, either because of triviality, or because of the time beyond which they occurred," and in view of the fact that experienced insurance men regarded insured's prior ailments as immaterial to the risk, and in view of the further fact that Finney never had an opportunity to correct any answer recorded by the examiner, in the absence of proof to the contrary, the jury might well infer that Dr. Caskin may have disregarded information imparted to him by Finney "as having no bearing on the risk," either because he regarded it as trivial, or having occurred at a time too remote, which, if recorded, would have now an important bearing on decedent's good faith. The documentary evidence shows a conscientious endeavor on the part of Mr. Finney to answer truly, so far as he knew, as to his prior condition of health in his applications for other insurance before and about the time the policy in suit was issued, and how much of this same information was imparted by Finney to Dr. Caskin and "disregarded" by him as matter, in his judgment, having no "bearing on the risk, either because of triviality, or because of the time beyond which they occurred," the evidence fails to disclose. This statement of Dr. Caskin and the statement of Dr. King, together with the confidential report of the latter to the Fidelity Company, after examining insured in 1898, stating that "Major Finney was a man thoroughly conscientious, and in giving his personal history perhaps states troubles which an ordinary person would overlook," and the fact that Maj. Finney corrected the answers to the medical examiner's report made on March 14, 1906, to the Provident Life & Trust Company for a policy for $5,000 in that company, with the oral evidence on this point at least, we think made a case to be submitted to the jury as to the good or bad faith of the decedent in imparting information to the defendant concerning his past history and health. I might here remark that the case at bar strongly illustrates the vice of omitting from the policy, in violation of the spirit of the Pennsylvania act of May 11, 1881, the answers of the decedent as to his past history and prior condition of his health.

The alleged errors in the other reasons for a new trial we think have been fully disposed of in the questions considered, excepting the seventeenth reason, which was the tenth point submitted by the defendant to the court to charge the jury as follows:

"(10) If the evidence shows that at any time prior to October 10, 1906, the insured had any serious illness or disease of an organic type as contradistinguished from a functional disorder, accompanied with circumstances that, to a reasonable and prudent man, must naturally lead him to suppose that he was afflicted with an illness or disease which might affect or impair his health and thereby must necessarily have been impressed upon his memory, it was his duty to disclose the same to the insurance company, and his failure to do so warrants you in finding, and I direct you to find, a verdict for the defendant."

This was refused by the court because the latter part of this point is somewhat confused. The last sentence, to wit, "and I direct you to find a verdict for the defendant," is an implied direction to the jury to make an affirmative finding as to the facts stated in the point, and this was a question entirely for the jury. As it stands, we think it was properly refused.

The motion for judgment non obstante veredicto is overruled, and the motion for a new trial is refused.