ANNIE A. GRATTAN as Administratrix, etc., Respondent, *v.* THE METROPOLITAN LIFE INSURANCE COMPANY OF NEW YORK, Appellant.

A warranty in an application for a policy of life insurance that a third person is in good health does not mean an actual freedom from illness or disease, but simply that the person has indicated in his actions and appearance no symptoms or traces of disease, and to the ordinary observation of a friend or relative is in truth well.

Where, therefore, in an action upon a policy, upon the question as to a breach of such a warranty, the court charged that if from the appearance of the person he was in good health so that anybody would so pro-

nounce him, and there was nothing to indicate he was not in good health, the warranty was not broken although in fact the germs of a hidden and lurking disease then existed. *Held* no error.

An application contained a warranty that the answers to the questions in the report of the medical examiner were "fair and true" and the applicant signed a certificate at the foot of said report to the effect that he had given true answers to the questions and "that they agree exactly with the foregoing." He gave a truthful answer to a question by the medical examiner, but the latter wrote a different and untruthful answer in his report. The evidence authorized a finding that the applicant did not see the answer as written in the report and was ignorant of the fact that it differed from that given by him. *Held*, that this having been found, the company, not the insured, was responsible for the falsehood.

Such a certificate can only be met and answered by proof establishing either that the answer was not written or was not known to the applicant when the certificate was signed by him; the burden of the untruth must be shown to rest solely on the agent of the company.

To prove the falsity of the answer as given in the report, defendant put in evidence a portion of a letter written by the insured. Plaintiff was permitted, under objection and exception, to read in evidence the remainder of the letter, which gave a history of the transaction, showing that the writer gave a correct answer and was ignorant of the fact that an untruthful answer was written in the report. *Held*, that the ruling was proper.

The introduction by one party of part of a conversation or a writing in evidence renders admissible on the other side so much of the remainder as tends to explain or qualify what has been received; and that is to be deemed a qualification which rebuts and destroys the inference to be drawn from, or the use to be made of, the portion put in evidence.

A physician who was called upon professionally to make an examination of T., brother of the insured, was asked "what opinion did you form, based on the general sight of the man before you made an examination, or before you had any conversation with him." *Held*, that the question was properly excluded as privileged within the statute. (Code of Civil Procedure, § 834.)

*Edington* v. *Ætna Ins. Co.* (77 N. Y. 564), distinguished.

After a physician called by defendant had been asked if T., upon whom he attended, died of consumption, and the question had been excluded, he was asked whether, in response to questions put by plaintiff's counsel on a former trial, he had not answered that T. died of consumption. This was objected to and excluded. *Held* no error; first, what the witness had testified to could only be proved to contradict him or refresh his memory; second, the plaintiff's inquiry on the former trial did not preclude his objecting to the evidence.

*Owen* v. *Cawley* (36 N. Y. 600), distinguished.

(Argued March 15, 1883; decided April 24, 1883.)

APPEAL from judgment of the General Term of the Supreme Court, in the third judicial department, entered upon an order made December 16, 1882, which affirmed a judgment in favor of plaintiff, entered upon a verdict. (Mem. of decision below, 28 Hun, 430.)

This action was brought upon a policy of insurance issued by defendant upon the life of Hugh P. Grattan, plaintiff's intestate. The defense was alleged breaches of warranty contained in the application; this warranted that all the answers to questions therein and to those in the examiner's report " are fair and true, without omission, concealment or mental reservation." The answer to a question in the medical examiner's report as to the condition of health of the applicant's brothers was " good." It was claimed by the defendant that this was untrue as to the intestate's brother Terence. The answer to a question as to the disease of which a sister had died was " not known to applicant." This was claimed to be untrue. The facts in relation thereto so far as material are stated in the opinion.

*William H. Arnoux* for appellant. Any false, incorrect or erroneous statement made in the application upon which the contract of insurance is based avoids the policy, if by the terms of the contract such statements are made warranties. (*Barteaux* v. *Phœnix M. L. Ins. Co.*, 67 N. Y. 595 ; *Ætna L. Ins. Co.* v. *France*, 91 U. S. 510 ; *Anderson* v. *Fitzgerald*, 4 H. L. C. 484; *Goddard* v. *Monitor M. L. Ins. Co.*, 108 Mass. 56 ; *State M. F. Ins. Co.* v. *Arthur*, 30 Penn. St. 315; *Grattan* v. *M. L. Ins. Co.*, 80 N. Y. 281; 24 Hun, 43; *Flynn* v. *Eq. L. Ins. Co.*, 78 N. Y. 575 ; *Foote* v. *Ætna L. Ins. Co.*, 61 id. 571; *Swick* v. *Home L. Ins. Co.*, 2 Ins. Rep. 415 ; *Duckett* v. *Williams*, 2 Cr. & M. 348; Bliss on Life Ins. 48, 59 ; *Ritzler* v. *World Mut. L. Ins. Co.*, 1 J. & S. 409, 414; *Fitch* v. *Am. P. L. Ins. Co.*, 59 N. Y. 557, 569; *Ripley* v. *Ætna F. Ins. Co.*, 30 id. 137 ; *Lasher* v. *N. W. Nat. Ins. Co.*, 18 Hun, 98; *First Nat. B'k* v. *Ins. Co. of N. A.*, 50 N. Y. 45.) The court erred in charging that if the defects were not patent

to general observation, even though they actually existed and were of so serious a character as when developed to cause the party's death, nevertheless it was not a breach of warranty. (*Bennett* v. *Buchan*, 76 N. Y. 386; *Bidwell* v. *N. W. Ins. Co.*, 68 id. 434; *Tallman* v. *At. Ins. Co.*, 3 K..87; *Mayor* v. *Ex. F. Ins. Co.*, id. 436; *Rowley* v. *Empire Ins. Co.*, id. 557, 561; *Ripley* v. *Ætna Ins. Co.*, 30 N. Y. 136.) The word "good" in the answer to the question concerning the condition of the health of the insured meant that his health was, in fact, not in appearance, good. (*Smith* v. *Ætna L. Ins. Co.*, 49 N. Y. 211; *Barteau* v. *Phœnix Mut. L. Ins. Co.*, 1 Hun, 430; Bliss on Life Ins. 146–150; *Peacock's Case*, 20 N. Y. 293; *Conner's Case*, 6 Chic. Leg. News, 144; *Scotch's Case*, 17 Scotch Jur. 253; *Horn's Case*, 64 Barb. 82; *Water Com'rs* v. *Burr*, 2 Sweeney, 25.) The medical testimony as to Terence's health was improperly excluded. (*Grattan* v. *Met. L. Ins. Co.*, 80 N. Y. 281; *Edington* v. *Ætna L. Ins. Co.*, 77 id. 564.) The statute may be expressly waived by the protected party himself asking the objectionable questions; or it may be waived negatively by interposing no objection to the question by the adversary. (*Johnson* v. *Johnson*, 14 Wend. 641–2; *Owen* v. *Cawley*, 36 N. Y. 400; 1 Phillips on Ev. 440; *Mc-Nabe* v. *Nat. L. Ins. Co.*, 13 Hun, 144.) Defendant properly introduced and read the first part of the letter containing an admission that the deceased knew the cause of his sister's death. (1 Greenleaf on Ev. [13th ed.] 218; Stark. on Ev. 26; *North* v. *Miles*, 1 Campb. 390; *Stern* v. *R. R. Co.*, 7 Leg. Gaz. 223; *Bartlett* v. *Eillard*, 3 Russ. 156; *Davis* v. *Spurling*, 1 Russ. & M. 68.) Where a party on the trial of a cause avails himself of an admission of his adversary to sustain his action or defense, the opposite party is entitled to prove such other parts of the conversation had on his part as tend to explain, modify or even destroy the admission made by him; but is not at liberty to call for such parts of the conversation had by him as relate to assertions made operating in his favor upon the general merits of the case, but having no connection with the admission made. (*Garry* v. *Nicholson*, 24 Wend. 350;

*Kelsey* v. *Bush,* 2 Hill, 440 ; *Rouse* v. *Whited,* 25 N. Y. 170; *Dilleber* v. *Home L. Ins. Co.,* 69 id. 258.)

*James Lansing* for respondent.   Terms in life insurance contracts, and indeed in all others, are to be construed in their popular and usual sense or signification, keeping in view the object and subject-matter of the contract.   (2 Parsons on Contracts [5th ed.], 501 ; *Delebar* v. *Home Life Ins. Co.,* 69 N. Y. 263 ; *Cushman* v. *U. S. L. Ins. Co.,* 70 id. 76.)   When the term " good health " occurs in the description of a living individual, it cannot denote any thing more than the absence of any ostensible or known or felt symptoms of disorder. (*Comer* v. *Phœnix Mut. L. Ins. Co.,* 6 Chicago Legal News, 144 ; *Hutchinson* v. *Nat. L. Ass. Soc.,* 17 Scotch Jurist, 253 ; Bliss on Life Ins. 148; *Scott* v. *Rose,* 16 Ct. of Sess. Cases, 1145 ; *Peacock* v. *N. Y. L. Ins. Co.,* 20 N. Y. 293 ; *S. C.,* 1 Bos. 338 ; *Cushman* v. *U. S. L. Ins. Co.,* 70 N. Y. 76 ; *Horn* v. *Amicable Mut. L. Ins. Co.,* 64 Barb. 82 ; Park on Insurance, 353 ; Angell on Fire and Life Insurance, § 313.) The term "good health" does not import a warranty against latent or imperceptible diseases, or those that can be discovered only by *post mortem* examination, or from symptoms disclosing themselves at an after period of time. (*Cushman* v. *U. S. L. Ins. Co.,* 70 N. Y. 77 ; *Peacock* v. *N. Y. Life Ins. Co.,* 20 id. 293.) The question whether the condition of health is misstated is one of fact, and, if there is any conflict of evidence, becomes a question for the jury.   (*Swift* v. *Mass. Mut. L. Ins. Co.,* 2 T. & C. 302 ; *McGinley* v. *U. S. L. Ins. Co.,* 8 Daly, 394 ; *S. C.,* 77 N. Y. 495 ; *Maury* v. *The World Mut. L. Ins. Co.,* 7 Daly, 324.)   The applicant having truthfully stated to the defendant's medical examiner the cause of his sister's death, and the medical examiner having inadvertently inserted the answer, " Not known to applicant," such erroneous answer must be taken as the declaration of the defendant; and in any controversy depending upon it must, as between the parties, be taken to be true.   (*Grattan* v. *Mut. L. Ins. Co.,* 80 N. Y. 292 ; *Mowry* v. *Rosendale,* 74 id. 360 ; *Flynn* v. *Eq. L. Ins. Co.,*

78 id. 568; *Grattan* v. *Mut. L. Ins. Co.*, 24 Hun, 43.) This is so although the answers as written by the agent were subsequently read to "applicant," and signed by him. (*Am. Ins. Co.* v. *Mahone*, 21 Wall. 152; *Wilcox* v. *Howell*, 44 N. Y. 398.) The defendant having put in evidence the entire letter of the plaintiff's intestate, to establish by an admission in a portion of the letter that said intestate knew the cause of his sister's death, the remainder of the letter, which showed that he truly stated the cause, and which tended to destroy or modify the use which the defendant might otherwise make of the admission, was competent. (*Rouse* v. *Whited*, 25 N. Y. 170, 175; *Wailing* v. *Toll*, 9 Johns. 141; *Credit* v. *Brown*, 10 id. 365; *Kelsey* v. *Bush*, 2 Hill, 440; *Smith* v. *Jones*, 15 Johns. 229; *Forrest* v. *Forrest*, 6 Duer, 102, 122–132; *Lawrence* v. *Ocean Ins. Co.*, 11 Johns. 241; *Walden* v. *Sherburne*, 15 id. 409; *Wynants* v. *Sherman*, 3 Hill, 74; *Kelly* v. *Dutch Church of Schenectady*, 2 id. 105.) When the agent of a company, with full knowledge of the facts, instructs the applicant as to the proper answer to be made by him to any question, the company is estopped by the act of the agent where there is no collusion or fraud on the part of the insured. (*Mowry* v. *Rosendale*, 74 N. Y. 360; *Flynn* v. *Eq. L. Ins. Co.*, 78 id. 568.) The seal which the law fixes upon privileged communications remains, unless removed by the party himself or his legal representatives. (*Edington* v. *Mut. L. Ins. Co.*, 67 N. Y. 196; Code, §§ 834, 836; *Grattan* v. *Nat. L. Ins. Co.*, 15 Hun, 75.) Communication to the sense of sight is within the statute as to privileged communications as much as if it had been oral, and reached the ear. It needs not that the examination should be private. It is enough that the physician acquired the information in his character of physician, and in the due and proper exercise of his calling. (*Edington* v. *Mut. L. Ins. Co.*, 67 N. Y. 185; 5 Hun, 12; *Grattan* v. *Met. L. Ins. Co.*, 80 id. 281, 297; *Pierson* v. *People*, 18 Hun, 248.)

FINCH, J. The defendant resists the verdict rendered in this action upon numerous grounds, the first of which is, that

there was a breach of warranty by the insured as to the health of his brother Terence; that there was no conflict of evidence to carry the question to the jury; and that the charge of the court upon the subject was erroneous. There was much and very strong evidence that, for a considerable period just before the warranty of the applicant that his brother's health was good, Terence was in fact ill, and was emaciated, weak, and had a consumptive cough. His employers so testify, and that, as a consequence, they sent him to their own medical adviser, Dr. Mareness, to be examined, upon whose report he left their employ as unable longer to endure the labor required. On the other hand, witnesses were examined who testified that during the same period he appeared to be in good health, that he looked like a healthy man, and gave no indications to the contrary. The controversy, therefore, revolves about the true meaning of good health as used in the words of warranty; the appellant contending that it means good, in fact, actual freedom from illness or disease, and that, so understood, there was no dispute about the facts since the sickness of Terence was proved, and the plaintiff's evidence never went beyond mere appearances and raised no issue over the real fact. But it must be remembered that the question put and the answer given related not to the applicant's own health but to that of a third person. Unless in rare and exceptional cases the insured answering could only answer from physical appearances and indications. He could not have the knowledge that an individual has of his own condition, though even in such case self-deception is not rare, and very often entirely innocent and honest. Such an inquiry and its answer must necessarily be understood in a general and ordinary, and not in a strict and rigid sense. One who is not a doctor and speaks not of himself but of a third person, necessarily gives rather an opinion founded on observed facts than an absolute and accurate fact when he describes the health of such person as good. He means, and is understood to mean, that the individual inquired about has indicated in his action and appearance no symptoms or traces of disease, and to the observation of an ordinary

friend or relative is in truth well.   He means that, because he
cannot usually mean any thing else; and the insurer naturally
and necessarily must so understand question and answer, and,
considered as a warranty, the answer warrants what it means
and nothing more.   The authorities almost, if not quite with-
out exception, justify this view of the scope and meaning of
an answer warranting the good health of a third person.
(*Cushman* v. *U. S. Life Ins. Co.*, 70 N. Y. 76; *Peacock* v.
*N. Y. Life Ins. Co.*, 20 id. 293.)   Upon such view of the law
the plaintiff's evidence was admitted, and the question of the
truth of the warranty submitted to the jury.   The criticism
upon the charge is that it confused the distinctions between a
representation and a warranty, and substituted the honest be-
lief of the applicant in the room of the actual fact.   Some
portions of the charge spoke of the answer given by the ap-
plicant as a representation, and of its falsity, if false, as a mis-
representation; but at the close of the charge its language and
purport in this respect were challenged, and the court thereupon
carefully explained its meaning.   The learned counsel for the
defendant asked the court to charge that the applicant " was
bound at his peril to know the truth of every statement that
he made, and whether intentionally or otherwise, if in fact any
statement that he made was not true, under the warranty it
vitiated the policy."   The court so charged, and added by way
of explanation, and to make clear the meaning intended to be
conveyed, " that if from all the appearances of the brother he
was in good health; in fact in good health, so that everybody
would so pronounce him; and there was nothing to indicate
to any person that he was not in good health," then the war-
ranty was not broken, although in fact the germs of a lurking
and hidden disease might exist.   All difficulty as to the differ-
ence between representation and warranty was thus cleared
away, and the meaning to be attached to the latter definitely
stated, and we think correctly.   A question of fact, was thereby
raised for the jury.   While the evidence of Jeffers and of
Warren showed the existence of ill health, the symptoms of
which were plainly apparent, and their conduct in sending him

to Dr. Mareness for examination, and his in submitting to it, and thereupon ceasing work furnishes very strong evidence of ill health, both actual and apparent, yet there is a considerable array of evidence in the contrary direction. Warren admits that he had before sworn he was not aware that Terence was a sick man until he returned with a paper from the doctor. Noelte, with whom Terence boarded, describes him as not sick and showing no such appearance; Fleming and Lewis, with whom he worked, say his health was good to their observation; Eicholz, the agent of the company, took his application for insurance, and the defendant's medical examiner certified the risk in the usual manner. Where the truth is in this contradiction it is difficult to say. Both the actual condition and the observable condition of Terence's health at the date of the warranty were put in doubt by the proofs, for the fair inference from the plaintiff's evidence, taken by itself, was not only that Terence seemed well, appeared well, but actually was in good health. The question of fact was submitted to the jury in terms quite as favorable to the defendant as the law of the case required, and their conclusion is beyond our review.

Another objection to the recovery is founded upon the answer given by the applicant to the medical examiner of the company which in the written statement denies, on the part of the insured, knowledge of the cause of his sister's death.

The question is serious. It is conceded that the sister of the insured, before his own application, died of consumption; that the insured knew the fact; that it was material to the action of the insurance company which was entitled to know the truth; that the fact was concealed and a false answer that the applicant did not know was made, either by the applicant or the medical examiner; that the false answer was in fact written down by the latter; but that the insured told him the precise truth and the actual fact. The controversy is thus narrowed to the single question, who was responsible for the falsehood; was the insured chargeable with it, or was it the sole fault of the company through its medical examiner? On the face of the papers it was the insured. His application, signed by him,

and with knowledge of the contents of which he is *prima facie* chargeable, declares and warrants that his answers to the questions therein contained, " and to those in the examiner's report herewith are fair and true." The examiner's report contains the falsehood ; and appended to that is the certificate of the insured, signed by him, in these words, viz. : " I hereby declare that I have given true answers to all questions put to me by the medical examiner, that they agree exactly with the foregoing, and that I am the same person described in the accompanying application, and whose signature is appended to declaration and warrant herewith." This certificate in terms confesses that the questions appearing upon the paper to have been answered by the applicant were in truth answered by him ; that they were written out upon the paper before its signature by the applicant ; that as so written they agree exactly with the answers made ; and that the insured knew that fact and had knowledge of how they were written. Stopping at this point the case is clear. It is one in which the truth is told to the medical examiner ; where the latter, instead of the truth, writes down a falsehood ; where the applicant reads and knows the answer that is written, and with full knowledge of its falsity as written certifies that it is true and " agrees exactly " with the answers in fact made. This is the applicant's written admission. It is conclusive upon him, unless by some sufficient proof he explains and rebuts it. If he did read the answer as written, if he knew of its presence and still certified to its truth, the fraud was his. The medical examiner might write down the untruthful answer by mistake or inadvertence, but the applicant could not read it and then certify to its truth without fraud. It is evident, therefore, that no proof can explain and answer the applicant's certificate which falls short of showing either that the answer was not written when the certificate was signed, or at least was not known to the insured when he made such signature. In a former case against the same defendant the first of these facts was proved. (*Grattan* v. *Met. Life Ins. Co.*, 80 N. Y. 292 ; 36 Am. Rep. 617.) In that case the referee expressly found that the whole of the medical examiner's certificate was in blank and the cause

of the sister's death was unwritten when the applicant signed it. In *Mowry* v. *Rosendale* (74 N. Y. 361) the same fact appeared. The applicant signed a blank and trusted to the agent of the company to fill it up thereafter. In *Maher* v. *The Hibernia Ins. Co.* (67 N. Y. 283) there was proof that the incorrect language of the policy was pointed out by the insured, but he was prevented from having the same corrected, or was thrown off his guard, and dissuaded therefrom by the acts or declarations of the agent of the insurer. The insured must show a state of facts indicating honesty and truthfulness on his part, and leaving the burden of having declared an untruth solely upon the agent of the company. The proof here relied upon for that purpose comes from the letter of the insured written to the company in answer to its assertion of fraud, its tender back of the premium paid, and its demand that the policy be canceled. The defendant introduced the letter and read so much of it as admitted that the applicant knew that his sister died of consumption, and the plaintiff read the rest under objection and exception. We think she had the right to do so. The whole of the letter was one connected narrative and an explanation of a single definite accusation. It was written to contradict the charge of a false representation as to the cause of the sister's death. To read part of it and suppress the rest distorts its purpose and meaning and turns a justification into a confession. The plaintiff could not have read it at all. When the defendant read a part of it he was bound to take with it all that explained or qualified what preceded. The rule appears to be firmly settled, both as to a conversation or writing, that the introduction of a part renders admissible so much of the remainder as tends to explain or qualify what has been received, and that is to be deemed a qualification which rebuts and destroys the inference to be derived from or the use to be made of the portion put in evidence. (*Rouse* v. *Whited*, 25 N. Y. 170; *Forrest* v. *Forrest*, 6 Duer, 126–7; *Gildersleeve* v. *Landon*, 73 N. Y. 609.)

Here the admission of knowledge by Hugh of the cause of his sister's death, relatively to the written answer signed by him, tended to convict him of a falsehood and a fraud. That was

the use to be made of the admission and the purpose of its proof. Whatever else in the letter tended to modify or destroy that effect of the admission and change its purport from a confession of guilt to an assertion of innocence, was a qualification of the statement to which the plaintiff was entitled. The case of *Dilleber* v. *Home Life Ins. Co.* (69 N. Y. 257 ; 25 Am. Rep. 182), to which we are referred, was of a different character. There the plaintiff was the wife for whose benefit the husband's life was insured. She, and not he, was the owner of the policy. His declarations, not part of the *res gestæ*, could not affect her. His letter, therefore, was only evidence of his knowledge of his condition, but not of the facts constituting it, when offered against the owner of the policy. It would have been such evidence as against him or his personal representative. But here the declarations of the letter were not admissible in behalf of the plaintiff at all, because she was the personal representative of the deceased. The defendant could waive that difficulty by putting such declarations, or a part of them, in evidence, on its behalf, but when it did so, must also make equally evidence that which tended to explain or qualify the portion which was used. We recur then to the letter. It is not in all respects clear and full, but substantially asserts entire ignorance of the answer written, and one given which was truthful. It begins with an explicit denial of having made any fraudulent misrepresentation, and then proceeds to state what it calls "the true facts." It avers that the company's agent solicited the two brothers to insure; that he came to their father's house for needed information; that the father took the Bible and from it gave the family ages and deaths, and the cause of the sister's death, which was consumption; that the agent wrote all these details down upon a slip of paper; that Terence and the agent went direct to the medical examiner, to whom the agent handed the slip with the answers upon it; that the doctor asked Terence if all those answers were correct and true, to which he said "yes," but "what he put down he does not know." The recital then adds, "the same was done with me, only in this, that I did not go with the agent." Stopping at this point in the

letter we must infer from its statements that each of the brothers signed the certificate in blank, leaving the medical examiner to fill it out afterward from the slip which was declared to be correct. This view of the case was that which prevailed and was held sufficient in the litigation over Terence's policy. But some things which follow in the letter indicate that Hugh did not sign in blank, and that the answers were written when he appended his name. He described his interview with the medical examiner, and says he "*took* those dates of ages from the slip, and *when he came to* the cause of my sister's death, he said, 'your sister died of consumption?' " I answered, "yes, sir ; in yours" (that is, in their letter to him) " you say that my answer was 'I did not know;' some person lies; we do not." This version of the scene indicates that the medical examiner, with the company's blank before him containing the list of questions, put them in their order and wrote down the answers as they were received. Still it does not follow that the protestation of the insured that he did not know what answers the doctor wrote is either untrue or improbable. It does not appear that he saw what was written, or read it himself, or that it was read to him. If the transaction took this latter shape, the medical examiner, receiving a true answer, wrote down a false one ; and his act could not be inadvertent, but was fraudulent. If so, he would be quite sure not to read the written answer to the insured, or permit him to read it, but procure his signature at the end through natural confidence and trust in the accurate statement of his answers. In any view, therefore, of this letter it raised a question of fact. It tended to explain and rebut the inferences flowing from the certificate of the assured and to throw the burden of the false answer upon the company's agent alone. (*Mowry* v. *Rosendale* and *Grattan* v. *Met. Life Ins. Co.*, *supra ; Flynn* v. *Eq. Life Ins. Co.*, 78 N. Y. 568 ; 34 Am. Rep. 561.) Upon the question of fact thus raised we must again be content with the verdict of the jury.

The question asked Dr. Mareness, viz. : " what opinion did you form, based on the general sight of the man, before you made an examination, or before you had any conversation with

him ? " was properly excluded as privileged within the statute. The doctor had never seen him before, nor seen him since. His whole knowledge came from the one interview, which was wholly and purely of a professional character. We have distinctly held in such a case that the communication to the physician's sense of sight is within the statute, and as much so as if it had been oral and reached his ear (*Grattan* v. *Met. Life Ins. Co.*, 80 N. Y. 297; 36 Am. Rep. 617), and that information derived from observation of the patient's appearance and symptoms must not be disclosed. (*Edington* v. *Mut. Life Ins. Co.*, 67 N. Y. 185.) The case here is not like *Edington* v. *Ætna Life Ins. Co.* (77 N. Y. 564). There the physician had seen the patient, both before and after he attended him professionally. He had a possible knowledge derived from observation when no professional relation existed. Here such relation began upon the instant that Terence came into his presence and continued until he disappeared from view. No information so acquired could be disclosed.

Dr. Halves was examined as a witness by the defendant, and testified that he was called as a witness on a former trial, but did not say by whom; and that he attended Terence in his last illness. He was then asked if Terence died of consumption, which was excluded. The question was then put whether upon such former trial he was not asked by the plaintiff's counsel if he attended Terence in his last illness, to which he answered in the affirmative, and that Terence died of consumption. This and some similar evidence offered was excluded. The appellant claims that this ruling is erroneous, upon the ground that the silence imposed upon the physician is a personal privilege which may be waived, and that the questions put on behalf of the plaintiff on the former trial amounted to such a waiver But the evidence was inadmissible for two reasons. What the witness testified to on a former trial, he being living and present for examination on the second trial, could only be proved for the purpose of contradicting him or of refreshing his memory. No emergency of that kind existed to justify the proof. To establish a waiver of the right to prevent disclosure,

the only proof necessary or competent in any event was the fact of the inquiry by the plaintiff. The answer given was not needed for such purpose. It was the question which opened the door. But we do not agree that the plaintiff's inquiry on the former trial precluded his objection on the latter one. It was an incident in the mode of trial. It waived for that occasion and under then existing circumstances an objection which might have been relied upon. It was in no sense an admission of the party, but proof by a witness. The party was not even then bound by the fact, but might disprove it. *Owen* v. *Cawley* (36 N. Y. 600), cited as authority, was a peculiar case. An order had been entered by the General Term entitling either party on the new trial to read the evidence which had been given on the other: And it was the admission of the party that was sought to be proved, and in that connection it was said that where an absolute and unqualified admission is made in a pending cause, whether by written stipulation of the attorney, or as matter of proof on the hearing, it cannot be retracted on a subsequent trial unless by leave of the court. The case is far from establishing that, because proof which might have been, was not, excluded on a first trial, it cannot be shut out on the second. Such a rule would tend to perpetuate and make incurable the errors or indiscretions or oversights of counsel, and hamper the second trial with a study of the first. We do not know how the plaintiff came to ask the questions. The case does not show who called the witness. The plaintiff may have asserted her privilege and been overruled by the court, and so driven to these inquiries without any voluntary waiver of her rights. We are of opinion that the evidence objected to was properly excluded.

· It was claimed that the assured warranted his occupation to be that of a soda-water "dealer," when in fact he was a soda-water "peddler." If there was any material difference between the phrases, it was cured by proof that the actual facts were truthfully stated to the defendant's agent, and the expression used was the latter's choice as correctly stating the truth.

Some other exceptions taken have been examined, but do not require special consideration.

The judgment should be affirmed, with costs.

All concur, except EARL, J., not voting.

Judgment affirmed.