## Piacine, Executor, v. National Life Insurance Company of the United States of America.

*V. J. Dalton,* for plaintiff.

*M. M. Burke* and *P. H. Burke,* for defendant.

HICKS, J., April 7, 1930.—The plaintiff sued to recover the amount of an insurance policy issued by the defendant company on the life of Franch Tait, under date of June 16, 1928, pursuant to his written application made on June 12, 1928. The insured died Dec. 30, 1928, or less than seven months after the application was made. The policy, offered in evidence, contained the following provision: "This policy, together with the application therefor, a copy of which is hereto attached and made a part hereof, shall constitute the entire contract between the parties hereto. All statements made by the

insured shall, in the absence of fraud, be deemed representations and not warranties; and no such statement shall avoid this policy unless it is contained in the written application therefor, a copy of which application is attached hereto." In Part 2 of the application for insurance and designated "Declarations in lieu of medical examination," signed by the decedent, appear the following questions and answers: "4. Have you any physical or mental defect or infirmity? No. 12. Are you now in good health and free from all symptoms and complaints? Yes. 13. How much time lost from work on account of illness during the last three years? None. 14. On what dates and for what complaints have you been attended by a physician during the last three years? None. 16. Have you ever had any of the following: Asthma? No. Any heart trouble? No."

The defense pleaded was that there was no liability under the policy, because the answers made by the insured to the questions above quoted were false and fraudulent as to matters material to the risk assumed by the company thereunder.

At the trial, there were offered the admissions apparent by the pleadings to the effect that the insurance contract was entered into; that death had occurred; proofs of loss furnished; refusal of payment demanded, and that the plaintiff was the person, if any, entitled to recover. The burden then shifted to the defendant to establish the fraud, which led to the issuance of the policy, and this it attempted to do by showing it was misled by the untruthful answers given to the questions above quoted. Testimony was offered by the plaintiff in rebuttal to that of the defendant. When all of the testimony for both sides had been taken, the defendant submitted to the court a request for a directed verdict under all the evidence for the defendant, which point the court reserved and submitted the case to the jury for its determination whether all, or any one of the answers, were intentionally false, for the reason that the burden of establishing the falsity of the answers and that they were deliberately made was on the defendant. After deliberating for approximately twenty-four hours, the jury disagreed and was discharged.

In pursuance of the provisions of the Act of April 20, 1911, P. L. 70, the defendant now moves for judgment in its favor upon the whole record. The said act provides, inter alia, as follows:

"Section 1. That whenever upon the trial of any issue a point requesting binding instructions has been reserved or declined, and the jury have disagreed, the party presenting the point may, within the time prescribed for moving for a new trial, or within such other or further time as the court shall allow, move the court to have all the evidence taken upon the trial duly certified and filed so as to become part of the record, and for judgment in his favor upon the whole record. . . ."

If, under the circumstances, we are convinced that, as a matter of law, we should have given binding instructions for the defendant, we must make the rule absolute and enter judgment in its favor: Trial by Jury, Moschzisker (2nd ed.), § 412.

With the introduction of the admissions apparent by the pleadings a prima facie case was made out for the plaintiff. The burden then shifted to the defendant, which was the establishment of the falsity of the answers and their deliberate making. Ordinarily, where the party who has the burden of proof relies upon the testimony of witnesses to make out his case or establish his defense, it is the province of the jury to pass upon the credibility of the witnesses. And while the court is frequently justified in expressing an opinion as to the weight of the evidence, the cases are exceptional where the court

is warranted in directing a verdict in favor of the party so situated: Clark v. Metropolitan Life Ins. Co., 62 Pa. Superior Ct. 192, 195; Arnold v. Life Ins. Co., 22 Pa. Superior Ct. 575, 577; Cobb v. Metropolitan Life Ins. Co., 19 Pa. Superior Ct. 228, 231. Or, to state the principle involved in another fashion, which would have warranted the court in directing a verdict for the defendant under all the evidence, was the evidence of the defendant clear, precise, indubitable and uncontradicted and of such a character that a capricious disbelief of it should not be permitted? Timlin v. American Patriots, 249 Pa. 465, 469; Moncur v. Western Life Ind. Co., 269 Pa. 213, 217; McEntee v. New York Life Ins. Co., 79 Pa. Superior Ct. 457; Gimbel v. Ætna Life Ins. Co., 95 Pa. Superior Ct. 1, 4.

Every case of false representation—as distinguished from warranty—is for the jury, where there is a real question as to the materiality of the answer, or of the good faith of the applicant in making the answers, or of the good faith and accuracy of the company's agent in writing down the answers, if they were written by him, or of the knowledge of the applicant of the answers so written, or where there is a dispute or contradiction as to the falsity of the representations: Suravitz v. Prudential Ins. Co., 244 Pa. 582, 588, 589; Skruch v. Metropolitan Life Ins. Co., 284 Pa. 299; Livingood v. New York Life Ins. Co., 287 Pa. 128; Gimbel v. Ætna Life Ins. Co., 95 Pa. Superior Ct. 1, 5-7; Panopoulos v. Metropolitan Life Ins. Co., 96 Pa. Superior Ct. 415, 424; Kuhns et al. v. New York Life Ins. Co., 297 Pa. 418, 423, 425. All the answers in this case were material and so held by this court, but the falsity of the answers and the good faith of the applicant in making them were the real questions for decision by the jury.

The 13th question, the answer to which is attacked, related to loss of time from work on account of illness during the three years preceding June 12, 1928, the date of the application. The deceased declared he had lost none. To prove the intentional falsity of this answer, the defendant introduced evidence to show that when he was admitted to the Pottsville Hospital on July 7, 1928, he told Dr. Carpenter that he could not work for some time, and the physician testified that he was unable to work when admitted and must have been unable so to do for some time. Dr. Moll, an interne, also testified that the insured had told him that he had not been able to work for some time, but on his second admission to the hospital on Oct. 29, 1928, the insured told him that he had not lost work for a long time until his first visit to the hospital. Dr. Striegel said that on Oct. 16, 1925, he was not working. In rebuttal, the plaintiff called Edward Lowery, an insurance agent for the Home Life Insurance Company, who had known deceased for eight years, and who visited his home once a week or every two weeks. He frequently saw him during this time working on a delivery truck and had seen him thus employed as late as the early part of June, 1928. Wesley Crone, agent of the defendant who wrote the application, testified that he had seen him working on a truck in May, 1928, and on the day when he signed the application. Joseph Piacine, who is in the general hauling business, said that the insured worked for him continuously from 1925 till his death, doing general hauling, moving, coal hauling and everything that came along, and that his health was good, very good. Frank Gallo, who knew the deceased for eight years and saw him once or twice a week and frequently visited his home, where he stayed, also testified as to his employment on the truck and around the house and that he always looked well. The falsity of the answer under the foregoing testimony could not be declared as a matter of law, as the contradictions and the credibility of the witnesses were for the jury. See Cobb v. Metropolitan Life Ins. Co.,

*supra,* p. 231; Arnold *v.* Metropolitan Life Ins. Co., *supra,* p. 577; Clark *v.* Metropolitan Life Ins. Co., *supra,* p. 195.

The 14th question concerns itself with the dates and complaints on and for which the decedent had been attended by a physician during the last three years. The reply negatived attendance by a physician. The defendant called Dr. John Striegel to prove that he attended him within three years, on Oct. 16, 1925. It appears from his testimony that Frank Piacine, the insured's employer, called at the doctor's office and asked him to come to the home of the insured to ascertain his condition, caused by an alleged injury previously sustained by him, prior to doing something along the lines of compensation. When the doctor called, he could find no evidence of injury, but found another physical condition, of which mention will be made later in connection with another matter. The doctor prescribed for this latter condition and saw him no more. The doctor was called to make an examination for physical injury and for no other reason. Was this being attended by a physician, so to be declared as a matter of law? We do not think so under the ordinary understanding of being "attended by a physician." The physician was called specially to make an examination as to whether the insured suffered physical injury, and found he had not. That he found something else, for which he left a prescription, is of no importance. He had completed the purpose of his professional call when he had made the vain examination for physical injury, and he understood it so, for he did not call again. Merely calling on a physician, or being called on by him, because of a temporary indisposition, not serious in its nature and not affecting the person's sound bodily health, is not being "attended" by a physician within the meaning of such word in an application for insurance: McBride *v.* Sun Life Ins. Co., 90 Pa. Superior Ct. 35, 41, 42. And in the instant case the physician did not call on the insured because of a temporary indisposition, even; he called to examine him for physical injury and he found he had none. And we think it is for the jury to find, and not for the court to declare as a matter of law, whether such call or professional visit amounts to being "attended by a physician" within the common acceptation of the term: McBride *v.* Sun Life Ins. Co., *supra,* p. 42.

The 4th, 12th and 16th questions will be treated together, since they relate generally to good health and disease and are particularly with answers as follows: 4. Have you any physical or mental defects or infirmity? No. 12. Are you now in good health and free from all symptoms and complaints? Yes. 16. Have you ever had any of the following: Asthma? No. Any heart trouble? No. Reading the 4th question, one thinks of a settled disease; an ailment that would probably result to some degree in the general impairment of physical health and vigor: 8 Corpus Juris, 1135. And in the 12th question, inquiry is made of good health, freedom from symptoms and complaints, followed in the 16th by the inquiry concerning the specific diseases of asthma and heart trouble. Thus it is apparent that the question "of good health" involves the three quoted. Defendant contends that the answers to these questions were false and deliberately made. If this is made apparent by undisputed proof, they must be declared intentionally false as a matter of law by the court; if not, the question must be submitted to the jury. What, then, do the proofs show?

We will first discuss, in connection with the three quoted questions, the defendant's testimony. On Oct. 16, 1925, more than two and one-half years before the date of his insurance application, Dr. John Striegel examined him for a physical injury and found none; but he did find his scrotum very much swollen; he had dysponea, breathed rather heavily, had some swelling of

the ankles and lower legs, while his heart showed a murmur and was quite enlarged. Although he did not have asthma, he had a lung condition which commonly terminates in miner's asthma. The doctor prescribed once for his heart condition and told him he needed attention, but he does not testify that he told him he had heart disease or asthma. The insured told him that he had trouble with his breathing. Dr. Striegel never saw him again. James Brennan, a mine foreman for whom the insured worked in 1924 and early 1925, testified that the insured told him that his "wind was short." Dr. J. S. Carpenter, Chief of Medical Service of the Pottsville Hospital, where the insured became a patient on July 7, 1928, testified that the patient had chronic myocarditis, which prevailed before the date of his insurance application, and that this heart condition began six or eight months, probably longer, previous to his admission; that he had no asthma, as the laity mean when speaking of that disease; had a large, swollen abdomen, hands and feet markedly swollen; breathing fast; the assured complained of shortness of breath, which the doctor ascribed to the faulty heart action; that in October, 1928, he was readmitted for a recurrence of the trouble; he also stated that Tait told him he had noticed in his work for several months that he was getting short of breath, so that he could hardly do it; that one might have shortness of breath for a couple of years and might not know it was due to his heart. Dr. Moll, an interne at that time, testified that the insured, when admitted, had chronic myocarditis, with which he had been suffering for more than six months. He further stated that the patient reported robust health theretofore. He also said one having shortness of breath would not know that he had a heart condition until in a progressive stage, and not every patient would attribute swollen feet or other heart symptoms, which insured had in the hospital, to a bad heart. Dr. L. D. Heim, Medical Chief of the County Hospital where insured was admitted on Dec. 15, 1928, and where he died on Dec. 30th following, stated that he was in the last stages of chronic heart disease when admitted, from which, in his professional opinion, the insured may have been suffering for a couple of years; and, further, that in June and July, 1928, he must have been so short of breath that he could not have worked. He also testified that he died from chronic valvular heart disease and that shortness of breath would not necessarily indicate to a patient that he had a heart condition. Dr. Louis M. Schultz, who had made an emergency visit upon the insured in the latter part of September or October, 1928, found him suffering with cardiac asthma and a chronic condition of the heart, which, in his opinion, existed from four to eight months previous to his visit. It will be noted that the last four doctors had not seen the patient until after the policy had been issued to him, and their testimony as to the heart disease existing previous to the application for the insurance was based alone upon their professional opinions. Mrs. Anna Webber, who knew the insured for five years, said that during the year before his death, the latter was all "out of wind," and told her he wished he was able to go to work; that he told her he had miner's asthma and his breathing could be heard. William Webber, her son, who went to work with the insured for seven years, testified that the insured was a little short of breath, but the witness did not think it would amount to much.

The plaintiff offered evidence in rebuttal. Dr. Henry Dirschedl, a medical examiner for a number of insurance companies, examined the insured on May 27, 1925, and at that time the latter had no myocarditis. Edward T. Lowery, an insurance agent for the Home Life Insurance Company, acquainted for eight years with the insured and seeing him very frequently up to June,

1928, when the application was signed, testified that he saw him frequently at work as a helper on a general delivery truck, and in June, 1928, his health appeared similar to that of any other time prior to that time, and he appeared in good health; that he never noticed anything wrong, or any difficulty, with or in his breathing.

Wesley F. Crone, the insurance solicitor for the defendant who wrote the application and delivered the policy, testified that the insured signed the application while at work; that he first saw him in May, 1928, and again as late as June 16, 1928; that he appeared like an ordinary person, showed no evidence of particular ill-health; nothing about his health which attracted attention; noticed nothing the matter with his breathing, although they sat together while preparing the application, and saw no portion of his body, limbs or feet swollen, or shortness of breath. Frank Gallo, an old acquaintance, who visited the home of the insured often and saw him once or twice a week, testified that the latter always looked well and never complained. Frank Piacine, insured's employer since 1925, testified that his health was "good, very good," and never noticed any shortness of breath. This was competent and relevant testimony: McBride v. Sun Life Ins. Co., *supra*, p. 39.

"Good health" does not mean absolute perfection of health, but only that the applicant has no grave, important or serious disease and is free from any ailment that seriously affects the general soundness and healthfulness of the system. Because of the contradictions and disputes in the proofs, the questions whether the deceased was in good health at the time the policy was issued, whether he had suffered from illness prior to that time, and whether, if he was in ill-health, he had knowledge of the fact and deliberately concealed the truth, were for the jury. As the answers to the questions propounded to him were representations and not warranties, a proven mistake in the information given in the application did not work a forfeiture of the rights under contract, in the absence of fraud: Mellosky v. Eureka-Md. Assur. Corp., 93 Pa. Superior Ct. 314, 317; Gimbel v. Ætna Life Ins. Co., *supra*, p. 7.

"Is an applicant for life insurance bound to know at his peril that he is suffering from a latent organic disease, so that his policy will be avoided if a representation that he is in good health afterwards turns out to be untrue in fact, although made in good faith at the time of signing the application? In a general way, it may be said that good health means apparent good health, without any ostensible, or known, or felt symptom or disorder, and does not necessarily exclude the existence of latent unknown diseases on the part of the applicant: May on Insurance, § 295. As to this question there is a distinction between covenants of warranty and of representation. This court held in United Brethren Mutual Aid Society v. Kinter, 12 W. N. C. 76, that where there was no warranty on the part of the insured as to his freedom from disease except those mentioned in the application, and there being no evidence that the insured had knowingly and wilfully misrepresented the condition of his health, the plaintiff was entitled to recover. That case was put upon the ground that the applicant is bound to exercise good faith in disclosing such facts about the condition of his health as are known to him, and which he honestly believes to be true, and that he is not bound to know at his peril of the existence of a disease which experience teaches may exist in latent form and concerning which one may not, in the very nature of things, have exact knowledge. To the same general effect, see Mouler v. American Life Ins. Co., 111 U. S. 335; Grattan v. Insurance Co., 92 N. Y. 274; Ferguson v. Insurance Co., 102 N. Y. 647. In Washington Life Ins. Co. v. Schaible,

1 W. N. C. 369, the court below held that the validity of the policy depended upon the good faith of the insured in making representations in regard to her health. The jury were instructed that if the applicant answered the questions honestly, and did not wilfully or fraudulently suppress facts known to her, the policy would not be avoided, although at the time of making the representations she may have had an organic disease in latent form unknown to her. The judgment in favor of the plaintiff was affirmed by this court. The same view was expressed by Mr. Justice Green in March v. Life Insurance Co., 186 Pa. 629-645, in the following language: 'We are not prepared to sustain the twelfth assignment, as the deceased might have been afflicted with an entirely occult ailment altogether unknown to her, and, in that event, her failure to communicate it to the defendant would not be a fraud upon the company:' " Suravitz v. Prudential Ins. Co., 244 Pa. 582, 588-590. See, also, Mellosky v. Eureka-Md. Assur. Corp., supra, pp. 316, 317; Skruch v. Metropolitan Life Ins. Co., 284 Pa. 299, 302, 303.

Under the authority of these cases, it was for the jury to say whether the deceased acted in good faith and honestly answered that he was in good health at the time of making the application for insurance. Did he know that he was afflicted with organic heart trouble, or had he been advised that he was suffering from such disease; if so, his answers as to the condition of his health and existence of disease were false and the policy would be avoided if the jury so found. On the other hand, if he did not know of his own knowledge, or from the symptoms which manifest themselves in diseases of the heart, or from consulting a physician, that he was suffering from latent organic heart trouble, and honestly answered that he was in good health, it is for the jury to pass upon all the facts relating to this branch of the case and to determine whether the applicant was in good health to the best of his knowledge and belief when he answered the questions.

A case supported by substantial, though circumstantial, evidence cannot be taken from the jury because of the strength of opposing proof. When a plaintiff's claim is supported by more than a scintilla of evidence, it must go to the jury, even where a verdict in his favor would be so greatly against the weight of the evidence as to require the granting of a new trial. Under the Act of April 20, 1911, P. L. 70, judgment can be granted on the whole record only where binding instructions should have been given to the jury: Derrick et al. v. Harwood Electric Co., 268 Pa. 136. "Binding instructions cannot properly be given in favor of one party, whether on the point of a right to recover generally or on a particular theory, unless, after accepting as true all the evidence of the other party which is favorable to his contention—except such testimony as is inherently improbable or is contradicted by unimpeached writings or by unquestioned physical facts—and after rejecting all the adverse testimony of the party seeking binding instructions, no other course is reasonably possible:" Statler v. Pennsylvania R. R. Co., January Term, 1930, No. 113, affirming C. P. Franklin Co., December Term, 1923, No. 113, Simpson, J. (not yet reported). As was said in Kuhns et al. v. New York Life Ins. Co., 297 Pa. 418, 423: "The burden of proving the falsity of the answer, and that it was deliberately given, is on the defendant who asserts it: Livingood v. New York Life Ins. Co., supra; Jackson v. State Mutual Benefit Ass'n, 95 Pa. Superior Ct. 56. Unless this situation is made apparent by undisputed proof, documentary or oral, the question is one for the jury, and is not to be declared as a matter of law by the court."

Under the facts disclosed by the evidence in this case, the truthfulness of the answers or the presence of an intention to mislead and deceive by the

replies was for the jury, and the jury having disagreed, a retrial should be had.

The motion of the defendant for judgment in its favor upon the whole record under the Act of April 20, 1911, P. L. 70, is hereby overruled.