Prudential Insurance Company of America, Appellant, *v.* Adamshick.

Argued March 4, 1942.

Before Keller, P. J., Baldrige, Stadtfeld, Rhodes, Hirt and Kenworthey, JJ.

*A. F. Vosburg,* of *Vosburg & Vosburg,* and *Sheridan & Sheridan,* for appellant.

*Patrick J. O'Connor,* with him *J. Q. Creveling,* for appellee.

Opinion by Stadtfeld, J., July 27, 1942:

This is a bill in equity by the Prudential Insurance Company of America, as complainant, to cancel a policy of insurance on the life of George Adamshick for the alleged reason that the policy was obtained by fraud. The fraud claimed by the complainant is alleged to be contained in certain answers in the application for insurance. The alleged fraud is based on two grounds:

first, that the insured was suffering from cancer at the time of the application for insurance and was not in good health, as his application stated; and, secondly, that he had been attended by a physician three years prior to the application for insurance. The appellee, in her affidavit of defense to the bill of complaint, admitted that the answers as stated in the bill of complaint were made, but denied that they were fraudulent and averred that the answers so made were in good faith; that the answers as stated in the application were true and correct as far as she knew; and that the applicant for insurance did not know that he was suffering from sarcoma or serious tumor of the neck and that he had had no serious illness for three years prior to the date of the application for insurance. The date of the application for insurance is October 6, 1932. The date of the policy is October 11, 1932. The only testimony that can be competent and relevant is that which shows the condition or state of George Adamshick's health at that time, and also the knowledge that the insured had of his health at that time or necessarily should have had.

The burden of proving the falsity of the answer, and that it was deliberately given, is on the insurance company who asserts it: *Kuhns et al. v. New York Life Ins. Co.,* 297 Pa. 418, 147 A. 76; *Livingood v. New York Life Ins. Co.,* 287 Pa. 128, 134 A. 474; *Mellosky v. Eureka-Maryland Assurance Corporation,* 93 Pa. Superior Ct. 314.

It is admitted by the complainant that the questions and answers in the application are representations and not warranties. This is a very important distinction, for it was said in *Livingood v. New York Life Ins. Co.,* supra, at pages 131 and 132: "It is first to be noted that the answers to the questions propounded to the insured were representations and not warranties, and, in the absence of fraud, a proven mistake in the information given did not work a forfeiture of the rights under the contract: *Skruch v. Metropolitan Life Ins.*

*Co.*, 284 Pa. 299; *Suravitz v. Prudential Ins. Co.*, 244 Pa. 582. ......

"When the applicant asserts he is in good health, and reasonably believes this to be true, though in fact, suffering from some insidious disorder, a recovery may be had. The insured is bound to honestly disclose facts concerning his physical condition, which he knew of, or should have observed, but he is not charged with knowledge of the existence of a latent disease of which, from the nature of things, he could have no exact information: *Suravitz v. Prudential Ins. Co.*, supra; *Barnes v. Fidelity M. L. A.*, 191 Pa. 618. 'Slight troubles, temporary and light illness, infrequent and light attacks of sickness, not of such character as to produce bodily infirmity or serious impairment or derangement of vital organs, do not disprove the warranty of good health': *Clemens v. Metropolitan Life Ins. Co.*, 20 Pa. Superior Ct. 567."

In *Suravitz v. Prudential Ins. Co.*, 244 Pa. 582, 91 A. 495, pages 588 and 589, it is stated: "There is another question which demands consideration. Is an applicant for life insurance bound to know at his peril that he is suffering from a latent organic disease, so that his policy will be avoided if a representation that he is in good health, afterwards turns out to be untrue in fact, although made in good faith at the time of signing the application? In a general way it may be said that good health means apparent good health, without any ostensible, or known, or felt symptom or disorder, and does not necessarily exclude the existence of latent unknown diseases on the part of the applicant: May on Insurance, Section 295. As to this question there is a distinction between covenants of warranty and of representation. This court held in *United Brethren Mutual Aid Society v. Kinter*, 12 W. N. C. 76, that where there was no warranty on the part of the insured as to his freedom from diseases except those mentioned in the application, and there being no evidence that

the insured had knowingly and wilfully misrepresented the condition of his health, the plaintiff was entitled to recover. That case was put upon the ground that the applicant is bound to exercise good faith in disclosing such facts about the condition of his health as are known to him, and which he honestly believes to be true, and that he is not bound to know at his peril of the existence of a disease which experience teaches may exist in latent form and concerning which one may not in the very nature of things have exact knowledge. To the same general effect see *Mouler v. American Life Ins. Co.*, 111 U. S. 335; *Grattan v. Insurance Co.*, 92 N. Y. 274; *Ferguson v. Insurance Co.*, 102 N. Y. 647. In *Washington Life Ins. Co., v. Schaible*, 1 W. N. C. 369, the court below held that the validity of the policy depended upon the good faith of the insured in making representation in regard to her health."

To the same effect, see *Adams v. Metropolitan L. Ins. Co.*, 322 Pa. 564, 186 A. 144; *Mellosky v. Eureka-Maryland Assurance Corporation*, supra.

In a footnote to the Adams case on p. 567, appears the following: " 'The term "good health," when used in a policy of life insurance, means that the applicant has no grave, important or serious disease, and is free from any ailment that seriously affects the general soundness and healthfulness of the system': *Barnes v. Fidel. Mut. Life Assn.*, 191 Pa. 618, 623. See also *Baer v. State Life Ins. Co.*, 256 Pa. 177, 183; *Horne v. John Hancock Mut. Life Ins. Co.*, 53 Pa. Superior Ct. 330, 333; *McBride v. Sun Life Ins. Co.*, 90 Pa. Superior Ct. 35, 41.

" 'One would scarcely contend that every dressing of an injured or infected finger, or every prescription for a cold, or treatment by a throat specialist could properly be classed as "attendance by a physician," when the patient shows no other signs of illness, or is not sick in bed or confined to the house. A reasonable construction must be placed on the term ...... In some

jurisdictions it is held that merely calling on a physician, or being called on by him, because of a temporary indisposition, not serious in its nature and not affecting the person's sound bodily health is not being "attended" by a physician within the meaning of such word in an application for insurance:' *McBride v. Sun Life Ins. Co.*, 90 Pa. Superior Ct. 35, 41-42. See also Couch on Insurance, section 889; Cooley's Briefs on Insurance, chapter XII, section 20 (d), (e)".

The insured himself being dead before this bill was filed to have the policy declared void, both sides had to rely in their proofs on the testimony of his wife, the beneficiary, and on the doctors and hospital records.

The court below after hearing all the evidence, made inter alia, the following findings of fact: "2. In said application, in answer to certain questions concerning the health of the insured, he answered as follows: 'Q. Are you now in good health? A. Yes. Q. On what dates and for what complaints have you been attended by a physician during the last three years? A. No.'

"Under the head 'Details of all illnesses recorded in questions 20 to 25 above,' the applicant replied 'None'. In answer to the following question, to-wit: 'Have you ever had a serious illness?' the applicant answered 'No.' In answer to the question: 'Have you ever had a severe injury?' the applicant answered 'No.' In answer to the question: 'Have you ever had medical or surgical treatment in a hospital or sanitorium?' the applicant answered 'No.' In answer to the question: 'Have you ever had cancer or tumor?' the applicant answered 'No.'

"3. At the time of making said application and said answers, the said George Adamshick did not know that he then had or ever had a cancer or tumor.

"4. At the time of making said application and said answers, the said George Adamshick, the insured, did not know he had or was suffering from or had had or had ever suffered from any serious disease or serious illness.

"5.  At the time of making said application and said answers, the said George Adamshick, the insured, believed himself to be in good and sound health.

"6.  Said application and answers in same were made to the Prudential Insurance Company of America, plaintiff, by George Adamshick, the insured, in good faith and without intent to commit fraud in the procurement by him of said insurance contract."

We quote from the decision of the court below: "In its attempt to sustain its burden of proof, plaintiff relied on the testimony of three of the four doctors, two of whom were dead at the time of the trial and two of whom testified before the trial judge.  Testimony of the former two given in a compensation hearing was offered, subject to defendant's objection to the competency of the testimony of one of them, Dr. Jackson.  At page 4 of the adjudication we sustained this objection in the following language which we think was right: 'We feel obliged to sustain the objection.  His testimony was confined to an examination of X-rays as bearing on the question of alleged injuries to one of Adamshick's vertebrae and, as the application for insurance was made on October 6, 1932, some months before Adamshick was injured at his occupation, and Dr. Jackson's testimony was given on April 6, 1936, his testimony, in our judgment, was both incompetent and irrelevant.  As to the tumor, cancer or sarcoma of the neck, Dr. Jackson's testimony is based on hypothetical statements received by him from other physicians subsequent to the date of the application.'

"The testimony of the other three physicians was carefully analyzed in the adjudication.  We adopted the testimony of Dr. Daley, the only one of plaintiff's doctors who saw and examined the insured near the time of his application.  He testified before the compensation referee that he first saw the insured on November 17 or 18, 1932 (six weeks after signing his application for

the insurance) ; that he diagnosed his ailment as a tumor on the left side of the neck, freely movable; that he assisted in the removal of the tumor at Mercy Hospital, Wilkes-Barre, on November 19; that the growth, a fibro-sarcoma, 'not highly malignant', was taken out in a clean sac; that the patient was discharged from the hospital on November 22; that the wound healed in three days; and that the patient, on Dr. Daley's advice, returned to work ......"

The chancellor found that plaintiff had not sustained its burden of proof. The court in banc was satisfied that the adjudication was right and that the exceptions should have been dismissed.

The doctors were. Dr. Byron H. Jackson, and Dr. D. F. Daley, both dead, whose testimony was read into the record; and Dr. J. A. Davis and Dr. H. A. Brown who gave testimony in person before the trial judge.

We quote from the adjudication of the chancellor in the court below: "Dr. Davis's testimony we regard as practically worthless. It certainly does not help plaintiff. He testified that he first saw the insured January 10, 1933, which was two months after the application for and issuance of the policy; also that he treated the insured after his alleged accident or after he was stricken at his work in the mines. This doctor had no first hand knowledge as to the condition of the insured's health at the date of the application. It was very difficult to elicit from him whether he made a diagnosis. He gave the history of the patient which he said he received partly from the patient himself, partly from the doctor's own observation, and partly from telephone conversations with Dr. Daley. It is, therefore, we think, incompetent, but, even if regarded as competent, his testimony that, in his opinion, the fibroid sarcoma had been in existence for about a year before his first examination on January 10, 1933, is contradicted by Dr. Daley who saw, examined and treated

Adamshick on November 17 or 18, 1932, that is, within six weeks after the application of the policy and within five weeks after the date of issuance. Dr. Davis testified (record, page 18) : 'Q. So on January 10th you were of the opinion that this man had a fracture of the vertebra and so treated him? A. Yes, sir. Q. You did not treat him for fibroid sarcoma on January 10th? A. No, sir, not on January 10th. Q. So you were not of the opinion on January 10th that this man had fibroid sarcoma? A. Not at the moment, no, sir. Q. Even though you had examined his neck. You examined the neck? A. Yes, sir, very carefully. Q. And you saw the scar of the operation there? A. Yes, sir.' "

It is clear from Dr. Davis's testimony that, upon admission to the Nesbitt Hospital after the mine accident or breakdown in January, 1933, Dr. Davis was of the opinion that Adamshick had a fractured neck for which he treated the patient for nearly three weeks, when, in a telephone conversation with Dr. Daley, the latter told Dr. Davis that Adamshick had a fibroid sarcoma in November, 1932. Thereupon, Dr. Davis discontinued the Sayre traction treatment, put a cotton cuff around the patient's neck to ascertain if there was a recurrence of the sarcoma which Dr. Daley had excised the previous November; and, no recurrence being observable, Dr. Davis put the cast back on the neck.

The testimony of Dr. Daley, who died some time before the trial, was read into the record. It contradicts Dr. Davis as to the vital questions in the case, namely, as to whether the insured had a sarcoma at the time of his application and the probability of his knowing it. These are the necessary inquiries bearing upon the question of fraud in obtaining the policy. Dr. Daley testified before the compensation referee that he first saw Adamshick on November 17 or 18, 1932, diagnosed his ailment as a tumor on the left side of the neck, freely movable, that the doctor had the patient admitted to the Mercy Hospital of Wilkes-Barre and

that Dr. T. A. McLaughlin removed it and I assisted in the operation, and on removal of this tumor microscopically it appeared like a benign tumor, but to my surprise after I ran it through a microscope I found it to be a fibro-sarcoma. This man made a nice recovery. He was only in the hospital on the 19th and was discharged on the 22nd, and the wound healed within ten days.

"Q. Was the growth taken out by a clean sac? A. Mass. It was incapsulated. Clean mass. Q. You say it was a fibro-sarcoma? A. Fibro-sarcoma, not a highly malignant tumor. Q. The patient recovered from the operation and returned to work? A. Returned to work."

Dr. Daley further testified: "I saw him probably about the 8th or 10th of December, completely healed, no discharge, no enlargement. He wanted to go back to work, and I said sure, you are all right to go back to work."

After a careful examination of the entire record we are satisfied that the findings are amply supported by sufficient, legally competent evidence.

The assignments of error are overruled and the decree of the court below is affirmed. Appellant to pay costs.